# EXHIBIT 1

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, STATE OF COLORADO<br>1437 Bannock Street, Room 256<br>Denver, CO 80202<br>Telephone: (720) 865-8301 | DATE FILED: January 5, 2023 3:51 PM<br>FILING ID: 6CCE98C692152<br>CASE NUMBER: 2023CV30043 |
| **Plaintiffs:**<br><br>JEFFREY SABIN, M.D.<br><br>vs.<br><br>**Defendants:**<br><br>THE PAUL REVERE LIFE INSURANCE COMPANY; UNUM GROUP | ▲ COURT USE ONLY ▲ |
| Attorneys for Plaintiff:<br>Zachary Warzel, No. 36546<br>Ross Pulkrabek, No. 31111<br>Address:  Keating Wagner Polidori Free, P.C.<br> 1290 Broadway<br> Suite 600<br> Denver, CO 80203<br>Phone No.: (303) 534-0401<br>Fax No.: (303) 534-8333<br>E-mail: zwarzel@keatingwagner.com<br> rpulkrabek@keatingwagner.com | Case Number:<br><br>Division: |

## COMPLAINT & JURY DEMAND

Plaintiff, Jeffrey Sabin, M.D., by and through his attorneys, Zachary Warzel and Ross Pulkrabek of the law firm of Keating Wagner Polidori Free, PC, for his Complaint and Jury Demand, states and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Jeffrey Sabin, M.D., is a citizen of Colorado who currently resides in Jefferson County. At all times relevant, Dr. Sabin held an enforceable insurance policy

1

underwritten by The Paul Revere Life Insurance Company ("Paul Revere"), which was designed to protect him in the event he became unable to perform the important duties of his occupation.

2. Defendant Paul Revere is a Massachusetts corporation with its principal place of business located in Massachusetts.  Paul Revere is an operating subsidiary of Unum Group.  Paul Revere, at all times relevant, was authorized to do business in the State of Colorado.

3. Defendant Unum Group is a Delaware corporation with its principal place of business located in Tennessee.  Unum is the parent company of Paul Revere.  Unum Group administers the disability policy described below and was involved in the handling of Dr. Sabin's claim.  Unum Group, at all times relevant, was authorized to do business in the State of Colorado.

4. Defendants, at all times relevant, engaged in the business of insurance in the State of Colorado.

5. Defendants' conduct, as described below, occurred in the State of Colorado.

6. This Court has personal jurisdiction over Defendants pursuant to Colorado's "long-arm statute," C.R.S. § 13-1-124.

7. This Court has jurisdiction over the subject matter of this action.

8. Venue is proper in the county designated in this Complaint pursuant to C.R.C.P. 98(c).  Defendants are nonresidents of this State and Plaintiff designates Denver County as the place of trial for this matter.

## FACTUAL ALLEGATIONS

**Purchase and Terms of the Policy**

9.      Dr. Sabin became an Orthopedic Surgeon, with a specialty in spine surgery, after graduating from medical school in 1983.

10.      On or about April 20, 1994, Dr. Sabin purchased an individual "Preferred Professional Disability Income Policy" from Paul Revere, Policy Number 0102663943 ("the Policy").

11.      The Policy is not subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*

12.      The agent at the time of the sale represented that the Policy would provide Dr. Sabin with full protection if he were ever to become unable to perform surgeries due to injury or sickness.

13.      In exchange for the payment of annual premiums, the Policy extends Dr. Sabin disability coverage.  This coverage is designed to ensure Dr. Sabin will receive guaranteed monthly income in the event he becomes disabled from his occupation as an orthopedic surgeon with a specialty in spine surgery, even if he is able to do other work.  For total disability, the Policy provides "lifetime" coverage; *i.e.,* there is no maximum benefit period and benefits will be paid for so long as Dr. Sabin remains disabled, until his death.

14.      The Policy contains the following pertinent provisions:

POLICY SCHEDULE

POLICY NUMBER:  0102663943                    DATE OF ISSUE:  APR 20, 1994

INSURED:        JEFFREY J SABIN MD

POLICY OWNER:   THE INSURED

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TABLE OF ADDITIONAL BENEFITS

| ADDITIONAL BENEFITS ATTACHED | AMOUNT OF BENEFIT | MAXIMUM BENEFIT PERIOD | ANNUAL PREMIUM PRIOR TO AGE 65 |
|---|---|---|---|
| LIFETIME TOTAL DISABILITY (858) | $15,000.00 PER MONTH | LIFETIME | $1,456.50 |
| COST OF LIVING (1104) | 4% - CPI - 4% | -- | $1,051.08 |
| TOTAL DISABILITY IN YOUR OCCUPATION | -- | -- | $581.00 |
| ASSOCIATION DUES BENEFIT (874) | $600.00 PER YEAR | -- | 0.00 |

\* \* \*

4

## PART 1
## DEFINITIONS

THE FOLLOWING WORDS HAVE SPECIAL MEANINGS. THEY ARE IMPORTANT IN DESCRIBING YOUR RIGHTS AND OUR RIGHTS UNDER THE POLICY. REFER BACK TO THESE MEANINGS AS YOU READ YOUR POLICY.

1.1     **"Policy"** means the legal contract between You and Us. The policy, the application, the Policy Schedule, and any attached papers that We call riders, amendments, or endorsements make up the entire contract between You and Us.

1.2     **"You"** and **"Your"** refer to the Insured named in the Policy Schedule.

1.3     **"We"**, **"Us"** and **"Our"** refer to The Paul Revere Life Insurance Company. Our Home Office is 18 Chestnut Street, Worcester, Massachusetts, 01608.

1.4     **"Date of Issue"** means the date that the Policy becomes effective. It is shown on the Policy Schedule.

1.5     **"Injury"** means accidental bodily injury sustained after the Date of Issue and while Your Policy is in force.

1.6     **"Sickness"** means sickness or disease which first manifests itself after the Date of Issue and while Your Policy is in force.  It includes Disability due to complications of pregnancy or childbirth.  It includes Disability due to normal pregnancy or childbirth after You have been Disabled for 90 days.

1.7     **"Physician"** means any licensed practitioner of the healing arts practicing within the scope of his or her license. A Physician must be a person other than You.

1.8     **"Physician's Care"** means the regular and personal care of a Physician which, under prevailing medical standards, is appropriate for the condition causing the disability.

1.9     **"Your Occupation"** means the occupation or occupations in which You are regularly engaged at the time Disability begins.

1.10    **"Total Disability"** means that because of Injury or Sickness:

   a.  You are unable to perform the important duties of Your Occupation; and
   b.  You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.

5

1.11   **"Residual Disability"**, prior to the Commencement Date, means that due to Injury or Sickness which begins prior to age 65:

   a. (1)  You are unable to perform one or more of the important duties of Your Occupation; or
      (2)  You are unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them; and
   b.  You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further care would be of no benefit to You; and
   c.  You are not Totally Disabled.

As of the first Commencement Date to occur, Residual Disability means that due to the continuation of that Injury or Sickness:

   a.  You incur a Loss of Earnings while You are engaged in Your Occupation or another occupation; and
   b.  You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further care would be of no benefit to You; and
   c.  You are not Totally Disabled.

Residual Disability must follow right after a period of Total Disability that lasts at least as long as the Qualification Period, if any. This period is shown on the Policy Schedule.

1.12   **"Recovery"** means a period which begins prior to age 65 during which:

   a.  You incur a Loss of Earnings which follows Total or Residual Disability which continued at least to the Commencement Date; and
   b.  The Loss of Earnings is due to the prior Injury or Sickness which caused the Total or Residual Disability; and
   c.  You are working full time in Your Occupation. "Full time" means at least as many hours as You were working before Your Disability began.

1.13   **"Disability"or "Disabled"** refers to continuing periods of Total Disability, Residual Disability and/or Recovery.  Successive periods will be deemed to be continuing if:

   a.  Due to the same or related causes; and
   b.  Separated by no more than 12 months;

Otherwise such periods will be deemed to be new and separate Disabilities.

1.14   **"Commencement Date"** is the day shown on the Policy Schedule when benefits begin during a Disability.

1.15   **"Maximum Benefit Period"** is the longest period of time for which We will pay benefits during any Disability. It is shown on the Policy Schedule.

We will not pay Residual Disability or Recovery benefits beyond the later of:

   a.  Your 65th birthday; or
   b.  The date on which 24 months of Disability benefits have been paid.

**PART 2**
**BENEFITS**

The monthly benefits payable under this Policy are subject to the terms of Part 9 "Claims".

**2.1   TOTAL DISABILITY BENEFIT**

We will periodically pay a Total Disability benefit during Your Total Disability. The monthly amount We will pay is the Maximum Monthly Amount.  It is shown on the Policy Schedule.

This benefit will begin on the Commencement Date. We will continue to pay it while You remain Totally Disabled. But in no event will We pay beyond the Maximum Benefit Period. For periods of less than a month, We will pay 1/30th of the benefit for each day of Total Disability.

**2.2   RESIDUAL DISABILITY BENEFIT**

We will periodically pay a Residual Disability benefit during Your Residual Disability.

The monthly amount We will pay equals:

$$\frac{\text{Loss of Earnings}}{\text{Prior Earnings}} \quad X \quad \text{Maximum Monthly Amount}$$

During any Disability each of the first 6 monthly payments of this benefit will not be less than 50% of the Maximum Monthly Amount.

The benefit will begin on either the Commencement Date or the day after Your Total Disability ends, if later. We will pay this benefit while Your Residual Disability continues, but not beyond the Maximum Benefit Period. For periods of less than a month, We will pay 1/30th of the benefit for each day of Residual Disability.

**"Loss of Earnings"** for any month means Your Prior Earnings minus Your Monthly Earnings for the month for which a benefit is claimed. This difference will be considered Loss of Earnings to the extent it is due to the Injury or Sickness which caused the Disability. The Loss of Earnings must be at least 20% of Prior Earnings.

If the Loss of Earnings for any month is 75% or more of Prior Earnings, We will deem the loss to be 100% of Prior Earnings.

**"Prior Earnings"** means the greater of:

    a.  Your average Monthly Earnings for the year just before Your Disability began; or
    b.  Your highest average Monthly Earnings for any 2 successive years during the 5 year period just before Your Disability began.

Starting as of the first Review Date, We will make an inflation adjustment to Your Prior Earnings.  We will multiply Your Prior Earnings by the CPI Factor. The result will be used until the next Review Date to compute Residual Disability benefit amounts payable.  However, the inflation adjustment increase will be at least 7% of Your Prior Earnings amount.

The inflation adjustment will not apply once the Disability ends.  But it will apply to recurrent Disability deemed continuing under the Recurrent Disability section of Your Policy.

7

"**CPI**" means the Consumer Price Index for All Urban Consumers. It is published by the United States Department of Labor. If this index is discontinued or if the method for computing it is materially changed, We may choose another index. We will choose an index which in Our opinion would most accurately reflect the rate of change in the cost of living in the United States. CPI will then mean the index We chose.

"**Review Date**" means the date that occurs:

    a.   After each successive 12 months of Disability; and
    b.   While Your Disability continues.

No Review Date will occur on or after Your 65th birthday.

"**Index Month**" means the calendar month four months prior to the calendar month in which a Review Date occurs. But the first Index Month for any Disability will be the calendar month 4 months prior to the month in which Your Disability began.

"**CPI Change**" means the result of a computation We will make as of each Review Date. We will divide the CPI for the most recent Index Month by the CPI for the Index Month prior to the most recent Index Month.

"**CPI Factor**" means the result of the CPI Change as of the current Review Date multiplied by the CPI Change for each prior Review Date occurring since the Disability began. The CPI Factor as of the first Review Date will equal the CPI Change as of that Review Date. A CPI Factor is determined as of each Review Date while Disability continues.

"**Monthly Earnings**" means Your salary, wages, commissions, bonuses, fees, and income earned for services performed. If You own any portion of a business or profession, it means:

    a.   Your share of the income earned by that business or profession;
    b.   Less Your share of business expenses which are deductible for Federal income tax purposes;
    c.   Plus Your salary and any contributions to a pension or profit sharing plan made on Your behalf.

Monthly Earnings does not include:

    a.   Income from deferred compensation plans, disability income policies, or retirement plans; or
    b.   Income not derived from Your vocational activities.

We will allow either the cash or accrual accounting method. But during a Disability the same method must be used when determining Loss of Earnings.

* * *

### 5.1   WAIVER OF PREMIUM

After You have been Disabled for 90 days, We will waive any premium that becomes due while You remain Disabled. Your Policy and its benefits will continue as if the premium had been paid.

We will also refund any premium paid that became due during those first 90 days of Disability.

When You are no longer eligible for Waiver of Premium, You can continue Your Policy in force by paying the next premium that becomes due.

Waiver of Premium will not apply to any premiums which become due after You elect the RENEWAL OPTION IF NOT EMPLOYED. HOSPITAL CONFINE-MENT INDEMNITY BENEFIT in PART 8.

### LIFETIME TOTAL DISABILITY BENEFIT RIDER

This rider provides a Lifetime Total Disability benefit.

**LIFETIME BENEFIT AFTER AGE 65**

We will pay this benefit during Your continuous Total Disability if:

1. The Total Disability begins before age 65; and
2. The Total Disability continues until age 65; and
3. The benefits under the Policy to which this rider is added have been paid during Your Total Disability.

This benefit will start to pay on the later of: (a) Your 65th birthday; or (b) the date the Total Disability benefit payable under Your Policy ends. We will pay it while You remain Totally Disabled for as long as You live.

**FOR INJURY**

For Total Disability due to Injury, the monthly amount We will pay will be the amount shown on the Policy Schedule.  Any Cost of Living benefit rider added to Your Policy shall apply to this amount.

**FOR SICKNESS**

For Total Disability due to Sickness, the monthly amount We will pay will be based on the amount shown on the Policy Schedule. Any Cost of Living benefit rider added to Your Policy shall apply to this amount. The amount shown on the Policy Schedule plus any Cost of Living in-crease that applies to this rider shall be multiplied by a factor. The factor to be used will be based on Your age at the start of Total Disa-bility which continues until age 65.

#### Factors by age for Total Disability due to Sickness

| | |
|---|---|
| 1.0 for 55 or less | .5 for 60 |
| .9 for 56 | .4 for 61 |
| .8 for 57 | .3 for 62 |
| .7 for 58 | .2 for 63 |
| .6 for 59 | .1 for 64 |

If a larger amount is payable under this Policy for the same period, the larger benefit will be payable in lieu of this benefit.

### GENERAL

This rider will end:

1. At the same time the Policy ends; or
2. On Your 65th birthday,

whichever happens first.

All definitions in Your Policy apply to this rider. All provisions of Your Policy stay the same except where We change them by this rider.

The annual premium for this rider is shown on the Policy Schedule.

The Date of Issue of this rider is the same as that of Your Policy. If We issued this rider after Your Policy, the Date of Issue is shown below.

15.     At the time Dr. Sabin purchased the Policy in 1994, he was a practicing orthopedic surgeon with a specialty in spine surgery.  The application for the Policy indicates that his Occupation is "Orthopedic Surgeon – Spine spec." and lists his "Exact Duties" as "Surgery of the spine / surgical spine fellowship – 1 year Univ. of CO."

16.     Dr. Sabin signed the application for the Policy on Page 2, acknowledging and agreeing to the following:

> I have read the statements and answers recorded above. They are to the best of my knowledge and belief, true and complete and correctly recorded. They will become part of this Application and the basis for any policy issued on it.

17.     Dr. Sabin continued in his occupation as an orthopedic surgeon specializing in spine surgery until his vision suddenly was damaged and he was rendered unable to continue performing surgeries in 2020.

18.     Before Dr. Sabin's vision was damaged, the reputation and qualifications that he had developed over many years as a practicing orthopedic surgeon specializing in spinal surgery led lawyers to retain him as an expert witness in litigation.  Dr. Sabin's acceptance of expert witness engagements was separate and apart from his normal clinical practice, with much of the work conducted after hours, at home, and on the weekends, and did not involve the treatment of patients.

**Onset of Dr. Sabin's Total Disability**

19.     On April 20, 2020, Dr. Sabin saw his ophthalmologist, Todd Maus, M.D., because of a sudden significant eye infection he developed during a trip to Arizona.

20.     Due to the infection, the pressures in Dr. Sabin's eyes became excessive.

21.     Eye drops, antibiotics, and oral medications were ineffective.

10

22.     As a result of the infection, Dr. Sabin ultimately underwent six separate surgical procedures in 2020 and 2021 to address the pressures, the resulting development of cataracts, and damage to nerve receptors in his eyes.

23.     While the pressures in his eyes have now normalized after extensive treatment, Dr. Sabin's vision was severely and permanently damaged.  He is no longer able to utilize fine sutures, fine forceps and pickups, he experiences photophobia, he has trouble judging depth perception, and has significantly decreased peripheral vision.

24.     On or around July 9, 2020, as a result of the damage to Dr. Sabin's vision, he was forced to stop performing surgeries so as not to endanger patients.

25.     Dr. Sabin, for a time, continued to see patients in an office setting, but was forced to refer patients to spine surgeons in other practices as needed.

26.     Due to his inability to perform surgery, Dr. Sabin was forced to close his clinical practice entirely on May 27, 2021, and can no longer treat patients even in an office-visit setting.

27.     Dr. Sabin no longer treats patients as a result of the damage to his vision.

28.     For now, Dr. Sabin continues to accept engagements for expert witness consulting in the legal setting. However, in addition to the fact that Dr. Sabin never intended that his occupation be an expert witness detached from any ability to practice medicine, it is anticipated that requests that he serve as an expert witness will diminish and ultimately stop in the future due to his inability to perform spinal surgery and treat patients.

**Dr. Sabin's Disability Claim**

29.     Dr. Sabin submitted a total disability claim under the Policy in October 2020.

11

30.     Dr. Sabin's eye doctor, Dr. Maus, submitted an attending physician statement to Defendants confirming Dr. Sabin's diagnosis and his inability to perform surgery.

31.     On January 6, 2021, Defendants wrote to Dr. Sabin agreeing that he was no longer able to perform surgery and agreeing that his "occupation is that of a self-employed orthopedic spine surgeon."

32.     Also on January 6, 2021, however, Defendants concluded that Dr. Sabin was not totally disabled because, "Although surgery is considered an important duty of your occupation at the time your disability began, the medical / legal reviews you perform in your occupation are also considered to be an important duty of your occupation."

33.     Defendants thus concluded that Dr. Sabin may be "residually disabled," but not "totally disabled" under the terms of the Policy.  Notably, "residual disability" under the Policy has a 24-month maximum benefit period.

34.     Dr. Sabin responded to the January 6th letter on January 10, 2021, explaining that his expert witness work was not an important duty of his occupation as a surgeon.

35.     On February 5, 2021, Defendants responded and asked for earnings, profit and loss, and tax information from prior to the onset of Dr. Sabin's disability.

36.     On February 12, 2021, Defendants reiterated their determination that Dr. Sabin was not totally disabled because he continues to perform expert legal reviews.  Defendants based their decision on an analysis of "Current Procedural Terminology" ("CPT") medical billing/production information preceding the onset of Dr. Sabin's disability to conclude that the main services he performed and billed for were surgical procedures (42%) and expert legal reviews (37%).

37.     This analysis completely disregarded the aspect of Dr. Sabin's surgical practice involving examination and treatment of patients in an office setting.

38.     This analysis of CPT billing and financial information is not the methodology or standard provided by the Policy for determining total disability.

39.     Dr. Sabin submitted a formal request for reconsideration through his attorney on April 23, 2021, explaining that the Policy covers Dr. Sabin's disability from his job as an orthopedic spine surgeon as stated in the Policy's application (which is incorporated into the Policy by reference and forms the basis for the Policy's issuance), and that it is obvious that a spine surgeon who can no longer perform surgery cannot do his job.  The letter also submitted statements from attorneys in the community concerning the likely demise of Dr. Sabin's expert witness side work.

40.     Defendants responded on May 17, 2021, upholding their prior decision that Dr. Sabin is not totally disabled from his occupation, and concluding, again, that his expert witness work is an important duty of his occupation as a spine surgeon.

41.     Defendants' determination that Dr. Sabin is not totally disabled was contrary to the Policy, contrary to Colorado law, and unreasonable.

42.     The Policy's definition of "Total Disability" is ambiguous and must be construed in favor of the insured under Colorado law.  The Policy, as written, does not require that the insured must be unable to perform "each and every" duty of his occupation in order to be considered totally disabled.

43.     Defendants' insistence that Dr. Sabin's acceptance of expert witness engagements was an important part of his occupation as a spine surgeon, and that his ability to continue doing

13

so precluded a finding of total disability, was a deliberate distortion intended to diminish the extent of his impairment and exaggerate his ability to do his job – thus allowing Defendants to severely limit the coverage provided by the Policy by categorizing Dr. Sabin as "residually disabled" and subjecting the claim to a 24-month maximum benefit period.

44.     Defendants knew, or should have known, that their definition "Total Disability" is ambiguous, and that such distorted parsing of an insured's "Occupation" is unreasonable, contrary to industry standards, and has been rejected by courts around the country. *See, e.g., Leonor v. Provident Life & Acc. Co., Paul Revere Life Ins. Co.*, 790 F.3d 682 (6th Cir. 2015) (finding identical definition of "Total Disability" to be ambiguous; insured dentist was totally disabled because injury prevented him from performing dental procedures, despite fact that insured continued to manage other businesses that he owned and income increased after onset of disability); *Smith v. Provident Life & Accident Ins. Co.*, No. 3:17-cv-104-MCR-MJF, 2018 U.S. Dist. LEXIS 245868, at *24 (N.D. Fla. Sep. 28, 2018) (finding it unreasonable for insurer to focus on billing information while ignoring the reality of doctor's practice and the type of surgical procedures he was capable of performing, and stating, "When an insured is no longer able to perform an activity that is 'at the core of his occupation,' he is totally disabled even if he can still perform other duties of his job that had been more lucrative.").

45.     All conditions precedent to Dr. Sabin's receipt of benefits under the Policy have been satisfied.

46.     Alternatively, Defendants' unreasonable conduct and breaches of contract have excused Dr. Sabin's compliance with the terms of the Policy.

47.     Since Defendants denied total disability benefits on January 6, 2021, Dr. Sabin has not performed any surgeries.  He was forced to cease seeing patients entirely, even in an office setting, on or about May 27, 2021.

48.     All available evidence from Dr. Sabin's treatment providers indicates that he will never again be able to perform the important duties of his occupation as an orthopedic surgeon specializing in spine surgery.

49.     As a direct and proximate result of Defendants' unwarranted and unreasonable denial of Dr. Sabin's total disability claim, Dr. Sabin has lost, and continues to lose, significant monthly income to which he is entitled.

50.     As set forth above, Defendants' failure and/or refusal to pay Dr. Sabin total disability benefits to which he is entitled is ongoing.  Absent an Order of this Court requiring Defendants to fulfill their obligations under the Policy, Defendants will continue to refuse to pay Dr. Sabin future total disability benefits to which he is entitled.

51.     As set forth above, Dr. Sabin's relationship with Defendants is so irreparably damaged that Dr. Sabin should not be forced to deal with Defendants in the future in an attempt to collect the total disability benefits to which he is entitled.

### FIRST CLAIM FOR RELIEF
**(Breach of Contract against Paul Revere)**

52.     Each and every allegation set forth in this Complaint is herein incorporated by reference.

53.     The Policy discussed above is a contract of insurance.

54.     The Policy was in full force and effect, with all premiums paid to date, at the time Dr. Sabin's total disability began and when the claim was submitted.

55.     Paul Revere breached the above-discussed contract by denying and/or delaying the total disability benefits due to Dr. Sabin.

56.     As a direct and proximate result of Paul Revere's breach of contract, Dr. Sabin has suffered damages in amounts to be proved at trial.

## SECOND CLAIM FOR RELIEF
### (Bad Faith Breach of Insurance Contract
### Against Paul Revere and Unum)

57.     Each and every allegation set forth in this Complaint is herein incorporated by reference.

58.     At all times relevant, Dr. Sabin held an enforceable contract for disability insurance issued by Paul Revere and administered by Unum.  This contract is herein referred to as the Policy.

59.     The Defendants owed Dr. Sabin a duty of good faith and fair dealing.

60.     Defendants breached their duty of good faith and fair dealing to Dr. Sabin by rendering an unwarranted and unreasonable disability determination and refusing to pay Dr. Sabin the total disability benefits to which he was and is entitled.

61.     That Defendants' disability determination was undertaken in bad faith is evidenced by the following facts, actions, and/or omissions:

a.     Defendants' knowing use of an ambiguous definition of "Total Disability" and deliberate interpretation of that definition in a manner that deprived Dr. Sabin of the benefits he was due;

b.     Defendants' refusal to pay Dr. Sabin's claim without conducting a reasonable investigation based upon all information;

     c.     Defendants' reliance on biased, incorrect, and/or self-serving information and opinions;

     d.     Defendants' insistence on reaching conclusions that run counter to the weight of the evidence;

     e.     Defendants' reliance on standards for disability and benefits eligibility which find no support in the Policy;

     f.     Defendants' failure to promptly pay Dr. Sabin's total disability benefits without a reasonable basis;

     g.     Defendants' decision to deprive Dr. Sabin of the benefits and protections of the Policy;

     h.     Defendants' decision to place their own interests above those of the insured;

     i.     Defendants' decision to engage in conduct prohibited by C.R.S. §§ 10-1-101 and 10-3-1104(1)(h); and

     j.     other conduct to be discovered in the course of these proceedings.

62.     Defendants knew that their conduct was unreasonable or recklessly disregarded the fact that their conduct was unreasonable.

63.     As a direct and proximate result of Defendants' bad faith breach of contract, Dr. Sabin has suffered, and will continue to suffer, injuries, damages, and losses.

### THIRD CLAIM FOR RELIEF
**(Violation of C.R.S. § 10-3-1115 against Paul Revere and Unum)**

64.     Each and every allegation set forth in this Complaint is herein incorporated by reference.

65.     Pursuant to C.R.S. §§ 10-3-1115 and -1116, a person engaged in the business of insurance shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first party claimant.

66.     Defendants are engaged in the business of insurance in the State of Colorado.

67.     Dr. Sabin is a first party claimant.

68.     Defendants may not unreasonably delay or deny payment to Dr. Sabin of total disability benefits owed under the Policy.

69.     Defendants have failed to pay Dr. Sabin the total disability benefits owed under the Policy.

70.     Defendants' failure to pay Dr. Sabin total disability benefits owed under the Policy is ongoing.

71.     Defendants lack a reasonable basis for their failure to pay Dr. Sabin past and/or future total disability benefits owed under the Policy.

72.     Defendants' unreasonable delay and denial of benefits constitutes one or more violations of C.R.S. §§ 10-3-1115 and -1116.

73.     Defendants' statutory violations have caused Dr. Sabin to suffer, and to continue to suffer, injuries, damages, and losses.

74.     Pursuant to C.R.S. § 10-3-1116, Dr. Sabin is entitled to recover reasonable attorneys' fees, costs, and two times the covered benefit unreasonably delayed and/or denied by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jeffrey Sabin, M.D., respectfully requests this Court enter judgment in his favor and against Defendants The Paul Revere Life Insurance Company and Unum Group for all damages he has sustained as a result of Defendants' unlawful actions and omissions, as described herein, including:

(A)     economic damages equal to the amount of total disability benefits owed to Plaintiff to the date of judgment;

(B)     statutory damages equal to two times the amount of total disability benefits owed to Plaintiff to the date of judgment;

(C)     economic damages equal to the amount of future total disability benefits owed to Plaintiff to his anticipated life expectancy of 83 years, reduced to present value, or, alternatively, placement on claim for receipt of ongoing total disability benefits from the date of judgment going forward;

(E)     non-economic damages in an amount to compensate Plaintiff for the aggravation, stress, worry, and fear caused by Defendants' bad faith conduct;

(F)     attorneys' fees and costs, as permitted by C.R.S. § 10-3-1116;

(G)     the costs of bringing this action, including expert witness fees;

(H)     pre- and post-judgment interest, statutory or moratory; and

(I)     any other such relief as this Court may deem just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES.**

Respectfully submitted this 5th day of January 2023.

KEATING WAGNER POLIDORI FREE, P.C.

By:   *s/ Zachary C. Warzel*
      Zachary C. Warzel, CO Reg. #36546
      Ross W. Pulkrabek, CO Reg. #31111
      1290 Broadway, Suite 600
      Denver, CO 80203
      Tel: (303) 534-0401
      Fax: (303) 534-8333
      zwarzel@keatingwagner.com
      rpulkrabek@keatingwagner.com

      *Attorneys for Plaintiff*

Plaintiff's Address:
2 White Fir Court
Littleton, CO 80127