Jeffrey Sabin , M.D. - July 24, 2023

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No.:  1-23-cv-00236-DDD-SP
_____

JEFFREY SABIN, M.D.,

    Plaintiff,

vs.

THE PAUL REVERE LIFE INSURANCE COMPANY
and UNUM GROUP,

    Defendants.
_____

VIDEO DEPOSITION OF JEFFREY SABIN, M.D.

July 24, 2023
_____

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

        ZACHARY C. WARZEL, ESQ.
        Keating Wagner Polidori Free
        1290 Broadway, Suite 600
        Denver, Colorado 80203
        Phone:  303-534-0401
        Email:  zwarzel@keatingwagner.com

ON BEHALF OF THE DEFENDANTS:

        STEPHEN BRESSLER, ESQ. (Via Zoom)
        Lewis Roca Rothgerber Christie LLP
        201 East Washington Street, Suite 1200
        Phoenix, Arizona 85004
        Phone:  602-262-5311
        Email:  sbressler@lewisroca.com

Also Present:

        Dennis Clayton, Videographer
        Nate Riveness

Page 1

**EXHIBIT 1**

Jeffrey Sabin , M.D. - July 24, 2023

Q. First of all, who is in the room with you?

A. The court reporter, Jessica, and then Mr. Clayton, who is the videographer, and then Attorney Zach Warzel.

Q. Okay. Is anyone else in the room?

A. No.

Q. Can we have an agreement that you will not communicate with Mr. Warzel during the pendency of a question, whether it be orally, verbally, nods of the head, electronically?

A. Yes.

Q. Okay. And do you have -- let me just ask it more generally. What do you have in front of you besides the notebook computer that the videographer or the court reporter provided to you?

A. I have a pair of glasses that sometimes are better to see the computer screen when -- with, if the computer screen is at a certain depth -- distance from me. Other than the glasses and a bottle of water, that's about it.

Q. Do you have any notes in front of you?

A. No.

Q. Any documents?

A. No.

Page 6

Q. What about a smartphone or other electronic device?

A. I do have a cell phone.

Q. All right. And you took that from your pocket?

A. Yes.

Q. And will it be staying in your pocket during the deposition?

A. It will, sir.

Q. Okay. Thank you.

Are you married?

A. I am.

Q. What is your wife's name?

A. Michelle Sabin.

Q. Okay. Do you have children?

A. I do. I have three -- three daughters.

Q. What are the ages?

A. About 38, 37, and about 33.

Q. Are any of them dependent upon you?

A. No.

Q. You have testified under oath before, correct?

A. I have.

Q. How many times do you think you've given deposition testimony?

Page 7

A. I've been doing deposition testimony for a number of years. So I would say -- it's hard to calculate. I didn't put that number -- I didn't prepare that number; but I would say since the mid-1990s till now, maybe four to five times a year.

Q. And when you date it back to the mid-1990s, is that when you first started doing medicolegal work?

A. That is correct.

Q. Did you also get deposed in your capacity as a treating physician?

A. No. Not for treat -- not for treatment for patients, no.

Q. Okay. I may not have made my question clear. Let's say, for example, that one of your patients had brought a personal injury lawsuit or made a workers' compensation claim. Were you ever deposed in your capacity as a treating physician?

A. Well, I wouldn't have been a treating physician in that case. So the question is kind of confusing, but I -- could you rephrase it?

Q. You had a -- in addition to your medicolegal practice, you had a private practice where you treated patients, correct?

A. Correct.

Page 8

Q. And my question to you is did you ever have an occasion where one of your patients may have brought a lawsuit or a workers' compensation proceeding and you were called to testify in your capacity not as an expert but rather as a treating physician for your patient?

A. I believe I was, yes.

Q. Have you testified at a trial?

A. I have.

Q. How many times?

A. Again, maybe four -- three, four times a year.

Q. And what about administrative hearings? Have you testified in those?

A. I have.

Q. And -- I'm sorry. I interrupted you. Go ahead, sir.

A. No. I interrupted you. I apologize.

I have.

Q. Okay. And how many times would you say you've testified at an administrative hearing?

A. Maybe two or three times altogether.

Q. Okay. And I would include in there workers' compensation proceedings. Does that impact your answer?

Page 9

3 (Pages 6 - 9)

EXHIBIT 1

Jeffrey Sabin , M.D. - July 24, 2023

Q. So Mr. Rood remained the agent on your policy with Paul Revere?

A. I don't believe so. I think it was a different agent.

Q. Okay. I'm a little confused. I thought you were working with Mr. Rood, and he had a comparison done of the Paul Revere policy versus Connecticut Mutual. Did I misunderstand you?

A. No. That was correct, sir. He -- he was trying to show me why he thought Connecticut Mutual was a better product than Paul Revere.

Q. Was another agent presenting the Paul Revere policy to you, or was Mr. Rood presenting it to you?

A. Another agent.

Q. And who was that?

A. I believe I saw that -- Mr. Perkins. I think his name was Todd -- Todd Perkins.

Q. And is Mr. Perkins -- or was Mr. Perkins located in Ohio or Colorado?

A. Going back that far, I want to say it was Colorado.

Q. Now, you mentioned you finished your spine fellowship. When did you finish your spine fellowship?

Page 18

A. 1991, I think. 1990, 1991.

Q. And was that at the University of Colorado?

A. It was.

Q. Okay. Is that when you went into private practice?

A. That's when I went into private practice here in Colorado, yes.

Q. All right. So in other words, you began in private practice in 1991?

A. I'll clarify that for you. It is confusing. In 1988 I went into private practice in Ohio doing general orthopedics.

Q. Okay.

A. After practicing for two years, I decided I wanted to -- although I already did spine, I wanted to do more spine and become more specialized. So I left my practice in Ohio and took a spine fellowship in Colorado. After -- that's a yearlong process.

After doing a spine fellowship in Colorado in 1990, 1991, then I stayed in Colorado. I didn't go back to Ohio. I stayed here and entered private practice again but now with a different group.

Q. Gotcha. Thank you.

And what group did you enter private

Page 19

practice with at that time?

A. Colorado Orthopedic Clinic.

Q. How long were you with them?

A. 15 years.

Q. Would that be from 1991 to 2005?

A. That is correct.

Q. And what happened in 2005?

A. There was differences of how the practice should be handled and how it should be run. We didn't see eye to eye on some things, and I decided -- well, that I would go to my own practice.

They did not want -- to be honest with you, they did not like what I was proposing in the practice; and they said, "Then you can go off on your own." And I did.

Q. Can you give us a little bit of a flavor of the dispute that -- difference of viewpoints that led you to go out on your own?

A. Sure. The -- I was the youngest -- one of the younger members of the group, even -- well, I had been there for 15 years. I was still one of the younger ones. There might have been one person younger than me. But the other guys in the group were getting on the older side.

They did not want to take trauma call

Page 20

anymore. They decided that that was too hard to take trauma call in the middle of the night, getting up at 3:00 or 4:00 in the morning, weekends and the whole bit like that.

I was against that decision. I said, "No. We should continue to take trauma call because that's what we do. That's what we're trained for." And I kind of brought up the fact that if they stopped taking trauma call, referrals will decline. You'll -- you'll be missing out on a lot of income, and it's going to affect you down the line.

They disagreed. So I was outvoted, and our office dropped trauma call. So what transpired was I stayed very busy. My spine practice was very busy. I was also going into doing some total joint surgery because I was still expert in that, and they -- they didn't like that I was keeping my practice busy, and they decided that "Well, our incomes have dropped so much, we think we should change the reimbursement way we do things in the office for the doctors' salaries; and we should put it all in one pot and share it."

And I said, "That's exactly what I was warning you about before. That's not going to happen."

And they said, "Then you can go on your own."

Page 21

6 (Pages 18 - 21)

**EXHIBIT 1**

Jeffrey Sabin , M.D. - July 24, 2023

So I basically was locked out of the office. I didn't have a key to get back in. I started on my cell phone. That's all I had was a cell phone, and I was able to find a small office space. And one patient at a time we built it up to the point where within a year I was super busy. Many of the patients from that old office found where I was. They came to me.

That practice went bankrupt in a year which is what I told them that would happen and -- and then I started on my own for the next 15 years being a solo practitioner. I did spine surgeries. The majority -- that was probably 50 percent of what I did, and the other 50 percent would be joint replacements.

Q. When you started the practice, is that -- was that when you started Precision Orthopedics?

A. Correct.

Q. So your practice has always been known as Precision Orthopedics from 2005 forward?

A. That is correct.

Q. And when you were working at Colorado Orthopedic Clinic, did they have any group disability insurance for the physicians in the practice?

A. Not that I'm aware of, no.

Q. So what you had was your Connecticut

Page 22

Mutual policy which you replaced with a Paul Revere policy around 1994?

A. Right. It was Paul Revere from 1994 onwards.

Q. Okay. Have you worked for any other practices besides Colorado Orthopedic Clinic and Precision Orthopedics? I think you said you had -- you were in private practice in Ohio?

A. Correct. For two years, between 1988 and 1990, Regency -- Regency Orthopedics.

Q. When you first started practicing on your own, you testified a few moments ago that you basically did it with a cell phone. Did you eventually open up an office?

A. Yes. I mean -- when I say cell phone, I mean, that's -- we didn't have -- when I say "we," I mean, I had an office -- got an office manager, myself. I had -- from that Colorado Orthopedic Clinic, 13 employees wanted to come with me; and I couldn't take them because I didn't have any patients. So I just took the secretary at the front desk and an X ray tech and an office manager.

And we started this practice with no computer at first and then we hurried up and tried to get a computer system set up and that was probably

Page 23

within a couple -- within a month, you know, we had that going. But starting out, we just had a cell phone for the first couple of weeks trying to, you know, call and get all the stuff ordered that we had and that kind of stuff to get a practice started.

We brought in the card tables from my home, folding chairs, and pictures off our wall at home and put them on the walls in this little, small office; and that was our office until we got built up and got a new office.

Q. When did you build up and get a new office?

A. Probably within about a year. We got busy enough within a year that we went down the hall in the same office building. There was a large office that was opened up for lease, and we took that.

Q. What was the address of that office?

A. 1630 Carr Street. No, no, no. No, no, no. It's been a while since I've been there. Union Boulevard. I can't -- I can't think of the address right now off the top of my head. I'm sorry.

Q. I have an address in my notes that I was trying to determine is when you first went there, and that would be 255 Union Boulevard, Suite 360.

A. That is it. Thank you, sir.

Page 24

Q. Okay. So that would be your first physical address? Union Boulevard was your first physical address. Then you moved down the hall after about a year?

A. Right. Yeah. So the suites would have changed, you know, during that first year but the same building. You're correct.

Q. Okay. And did you remain there until you ended up closing your practice?

A. I did.

Q. Okay. And we'll talk about that a little bit later this morning, but when did you officially shut the doors of your practice?

A. May 31st, 2021.

Q. Did you continue to do further orthopedic work beyond May 31, 2021?

A. No.

Q. Do you know what business now occupies your former space on Union Boulevard in Suite 360?

A. I do not. I know I've driven by it a couple of times and didn't see any new names up on the street sign. So I have no idea if anybody took that over yet.

Q. Is Precision Orthopedics an LLC, an LLP? What kind of entity is it?

Page 25

7 (Pages 22 - 25)

Jeffrey Sabin , M.D. - July 24, 2023

A. It was a -- help me. I can't think of -- 10:35:18 I can't think of -- no, I don't think it is. It's -- I can't think right now. I'm sorry. It's got some letters after it.

Q. But whatever entity it is, does that 10:35:38 still exist today?

A. Yes.

Q. What is the address for Precision Orthopedics today?

A. Right now we have a P.O. box number 10:35:49 and -- because I work out of the home. So instead of having come -- things come to the home, they go to a P.O. box, and I don't -- I'm sorry. I don't have that at the top of my head. You might have it, but I don't have it. 10:36:06

Q. I've seen an address listed of 2 White Fir Court, Littleton, Colorado 80127. Is that your home address?

A. That is.

Q. And then I've also seen an address of 10:36:18 6698 Iris Street, Littleton, Colorado 80162. Do you recognize that address?

A. I do. I do. That is the P.O. box number.

Q. And then I've seen another address of 10:36:35

Page 26

6052 South Sheraton Way, Littleton, Colorado 80123. 10:36:38 Does that ring a bell?

A. No. I -- I think that's my office manager's home address. So nothing goes there that I know of. 10:36:54

Q. Who is your office manager?

A. Jim Sabin. It's -- he's my brother.

Q. Now, when you went out on your own, you said that you took an office manager, a secretary, and an X ray tech. Was the office manager at that time your 10:37:09 brother, Jim Sabin?

A. It was.

Q. Did -- and if you don't mind, I'm going to refer to him by his first name so we don't get confused with Sabins; and I don't mean any disrespect to 10:37:24 him.

Did Jim work at Colorado Orthopedic Clinic before you or after you?

A. He was hired after I was there. The office partners decided they wanted to hire him. I was 10:37:37 not necessarily for it, but they -- they wanted him. So I just gave in and said, "Sure."

Q. When he came over to work for you, did he officially leave Colorado Orthopedic Clinic or was he an office manager for both entities? 10:37:54

Page 27

A. No. He left. 10:37:56

Q. And when he became your office manager, did he remain in that position all the way through May 2021?

A. He did. 10:38:06

Q. And did he have other responsibilities beyond Precision Orthopedics, or were -- was he a full-time office manager for Precision Orthopedics?

A. He was a full-time -- full-time office manager. 10:38:20

Q. And what's Jim doing today?

A. Jim, after 5/21/2000 -- after 5/31/2021 when we closed the practice, he stayed behind at the office space probably for about three or four months to clean up the office space, have all the charts -- 10:38:38 written charts for the patients because we sent out letters to all the patients, and they would -- they were told that they could come and pick up their records. So he would stay behind when patients came to pick up their records. He was just, you know, cleaning up all the 10:38:54 outstanding accounts receivable, that sort of thing.

And what he did is he then started being -- continuing the office manager for what I do today which is -- now, unfortunately, it's all a different aspect now. It's all medicolegal. So he will 10:39:12

Page 28

handle all the checks that would come in from the 10:39:17 various entities, and he does all the office work and the FICAs and the -- all that kind of stuff and -- that you do in -- that an office manager does. So I don't -- I just deal with reviewing charts. I don't do any of 10:39:33 the business side of things.

Q. Is this a full-time position for him?

A. Yes.

Q. In other words, Precision Orthopedics continues to be in business today, but it's limited to 10:39:46 medicolegal work. Correct so far?

A. Right. We had to change it to medicolegal. We had to totally put out letters and stop what we were doing before.

Q. And Jim remains the office manager for 10:39:59 the practice on a full-time basis?

A. He does.

Q. Is there anybody else employed by Precision Orthopedics besides yourself and Jim?

A. No. 10:40:10

Q. A few moments ago, if I remember correctly, you told me that you thought that -- was it Todd Perkins was the agent for the Paul Revere Life Insurance policy that you purchased around 1994?

A. I believe so. I remember seeing that 10:40:33

Page 29

8 (Pages 26 - 29)

EXHIBIT 1

Jeffrey Sabin , M.D. - July 24, 2023

back in the day.    10:45:51

Q. In other words, was it mailed to you? Did the agent come to you and give it to you? Do you remember?

A. I don't remember.    10:45:58

Q. When you got the policy, what did you do with it?

A. I filed it away.

Q. Did you read it at that time?

A. Yeah. I think I just -- I looked at    10:46:10 the -- at the monthly benefit and that it was occupation specific, and that's -- that's all I read. That's all I can recall.

Q. What did you look at in the policy to confirm it was occupation specific?    10:46:25

A. Well, there's -- there's verbiage in there that talks about it being an occupation-specific policy. So I just read that that said it was specific to what you do as the major part of your occupation.

Q. Do you remember what specifically in the    10:46:44 policy you were looking at to confirm your understanding?

A. What section, what paragraph, no, I don't.

Q. For example, do you know whether you were    10:46:53

Page 34

looking at the definition of total disability or whether    10:46:55 you were looking at something else?

A. I remember reading the definition of total disability. So thank you for bringing that to my attention. I do remember reading under that where it    10:47:07 was stated, as I told you, that you would be considered totally disabled if you couldn't do the major portion of your job. So I do remember that.

Q. Have you ever read the policy cover to cover?    10:47:37

A. No. It's got a lot of verbiage I don't understand completely. So I don't recall reading the whole thing cover to cover.

Q. Do you still have a copy of the policy that was provided to you back in 1994?    10:47:53

A. I think I still have it or Mr. Warzel might have it but we've still got it somewhere.

Q. Besides Connecticut Mutual and Paul Revere, have you ever had any other disability insurance coverage?    10:48:08

A. No.

Q. Do you remember when you stopped working?

A. Could you clarify? Stopped working as an orthopedic surgeon?

Q. Well, at some point you stopped -- I'll    10:48:26

Page 35

just say the surgery, but then you also stopped your    10:48:32 practice. And I -- I'm just trying to understand dates here because -- and I'll tell you, sir, you submitted a claim listing, I think it was, your last day of work as July 6, 2020; and then you returned July 27th.    10:48:49

So I'm deliberately asking it in an open-ended fashion so I can understand the circumstances --

A. I understand.

Q. -- and chronology.    10:49:02

A. I understand. Yes. I -- the last time I was able to perform surgery would have been about July 6, 2020, because I had surgery on July 9th, 2020, on my eyes.

It was a fairly rapid surgery in that it    10:49:18 was the left eye on July 9th. It didn't take. They did it again, I think, on the 16th, a week later. And then once that was working, then they did -- July 22nd, they did the right eye. After those surgeries, my vision never returned.    10:49:42

So I had -- I had the diagnosis made that my pressures were high in my eye obviously before that. I continued to practice. I could still see. I could still do surgery. But then after the July 9th surgery, that's when my vision became double vision, cloudiness,    10:49:58

Page 36

depth of vision was lost; and so I couldn't return to    10:50:03 doing a surgeon -- to being a surgeon after July -- after July 9th.

What I could do -- what I was hoping that would happen is that the -- the vision would slowly    10:50:15 return. I kept thinking, "Okay. Things are going to get better. Things are going to get better."

So -- and I still had patients that were coming to the office. So I kept the office practice open. I wasn't doing any more surgery, hoping that I    10:50:28 would get back into surgery; but as time went on, my vision wasn't returning.

The ophthalmology -- ophthalmologist said, "Well, you know, because of all the mucking around with the surgery in your eyes and such, it's causing a    10:50:49 lot of inflammation. Cataracts are forming now." He goes, "If we take out the cataracts, that may improve your surgery."

So I kept my hopes up that, okay, once we get the cataracts taken care of, I can return back to    10:51:02 doing surgery. Cataract surgery was done in November -- late November -- mid/late November and into December and it did clear up a little bit but it didn't get rid of the cloudiness. It didn't get rid of double vision. It didn't get -- didn't get rid of the depth perception    10:51:26

Page 37

10 (Pages 34 - 37)

Jeffrey Sabin , M.D. - July 24, 2023

problems. 10:51:29

So I was forced -- well, not forced. That's the wrong thing to say. I had to give up my interest in the surgery center. As long as I was doing surgery, I was part of a surgery center that I had 10:51:41 started up. And -- but one of the rules was that you have to be able to be doing surgery in order to be part owner, and I hadn't operated there now in almost six months.

So I had to give that up because I was -- 10:51:56 I couldn't participate in any of the income they were making from that. So I gave that up, and then it became obvious that "Hey, this eye stuff is not getting better. I'm going to have to slow down my practice and stop it," because things were starting to wind down. 10:52:14

What I mean by that is that since I couldn't do surgery, I wasn't getting any referrals. Doctors were sending me stuff but only for nonoperative things, nothing that needed surgery; and all the surgery they were sending someplace else. 10:52:31

And then the number of patients I was seeing in the office was declining. I was just seeing, you know, follow-ups on surgeries I had done in the past. I was giving advice to patients, and then I would send them off to my competitor surgeons to do the 10:52:45

Page 38

surgery if they needed surgery. I had my -- I had a PA 10:52:48 at the time. He was doing most of the injections in the office.

So I could tell it wasn't going to be sustainable going forward just doing an office practice 10:53:01 if you couldn't do surgery. So I announced that I'm -- to all my patients that I would close the practice as of 5/31, and then that's the last time I was in the office. But I hadn't done surgery, you know, for almost a year before that back to July 6. 10:53:20

Q. Let me follow up on a couple of things that you mentioned in that answer. First, you said that you -- you had an interest in a surgery center. What is the name of the surgery center?

A. OrthoColorado Hospital. 10:53:41

Q. And what was your interest in it before you had to give it up?

A. 1 percent or something like that or -- I don't -- I'm guessing. I shouldn't say; but it was, you know, a real small number. 10:54:01

Q. And were all your surgeries done at the OrthoColorado Hospital?

A. No. I would say about 90 percent -- 85, 90 percent were done there. The other surgeries were done at St. Anthony's Hospital and Lutheran Medical 10:54:16

Page 39

Center. 10:54:19

Q. Did you have an interest in either of those?

A. No.

Q. You mentioned that a physician's 10:54:28 assistant in your office was doing injections. What was the name of your physician assistant?

A. I knew you were going to ask that. It's Tom -- Tom Menshenfriend, and I'll spell that for you. It's M-e-n-s-h-e-n-f-r-i-e-n-d. 10:54:43

Q. Where is Mr. Menshenfriend today?

A. Well, he -- once I stopped the practice, he was -- he had to find -- find another job. So he had plenty of warning, also, that we were closing the practice; and now he works -- he got a job soon after. 10:55:01 He was highly sought after. He was a very good PA. He got a job at a plastic surgeon's office. So he works in plastic surgery now.

Q. What's the name of the office of the plastic surgeon? 10:55:16

A. I couldn't tell you. I'm sorry.

Q. You filled out an individual -- a claim form called an individual statement when you submitted your claim; and if you'd like to, I can have the concierge show you that individual statement. And it's 10:55:30

Page 40

Claim File Document Numbers 49 to 52. 10:55:36

A. Yeah. I'd have to see that, I guess.

Q. Yeah. I have just a couple specific questions on it and we'll have them call it up and we will mark this as Exhibit Number 21. 10:55:52

MR. BRESSLER: And if we could scroll down to --

Q. (By Mr. Bressler) And if you need to look at something before I scroll down, just tell us to stop. It's not our intent to pull it away from you. 10:56:12

MR. BRESSLER: But if we could scroll down to Section B. You went a little too far. There we go.

Q. (By Mr. Bressler) It says, "Information about your disability date," and then below that it 10:56:25 says, "What is the name of your medical condition?" Do you see that question?

(Exhibit 21 was marked.)

A. I do.

Q. Okay. And I guess, more generally, this 10:56:36 is in Section C, "Information about the condition causing your disability," correct? Just a little bit above that.

A. Yes.

Q. And then there's two parts to Section C. 10:56:52

Page 41

11 (Pages 38 - 41)

**EXHIBIT 1**

Jeffrey Sabin , M.D. - July 24, 2023

Q. (By Mr. Bressler) You may have answered 11:13:04 this for me, but what duties were you still able to do as of July 9, 2020?

MR. WARZEL: Form.

A. I could examine the patient with -- you 11:13:14 know, reflexes, muscle strengths. I could listen to the patient's history. With the X rays, we still -- we looked at some X rays on computer in which case you can blow it up. X rays that were hard copies, I would have to take a magnification lens sometimes and hold that up 11:13:30 to see what I wanted to see or look for on plain X rays.

But I was -- you know, with using modifications, I could still do those things. I could -- I could still write reports, dictate, you know, voice recognition, and then refer patients off to -- if 11:13:51 they needed surgery.

Q. (By Mr. Bressler) As of July 2020, how many active patients did you have in your practice?

A. I -- boy, I couldn't answer that. I would not -- I would not know. It was hundreds and 11:14:14 hundreds and hundreds. I mean, because they had -- we had so many medical records that we had to give away or try to -- try to get ahold of patients to come pick up; and, you know, I -- I couldn't even -- I couldn't even -- I couldn't even guess. I'm sorry. 11:14:31

Page 54

Q. What treatments did you -- and I'm 11:14:34 looking just for the range. What were the range of treatments that you provided to your patients?

A. Well, the main -- the main treatment after July 2020 would be advice. I mean -- 11:14:47

Q. Let me stop you. I was looking before July 2020.

A. Oh. Well, the --

Q. Just as of July 2020 -- and let's make it before July 9, 2020. 11:15:00

A. Well, before July 9th, 2020, my main activity was that of being a surgeon, doing surgical procedures at the three locations we talked about. And that would involve going into the hospital on my surgery days which were Tuesdays and Thursdays, making rounds in 11:15:18 the morning at the -- at the three hospitals depending on which patients were where, talking to the -- talking to the families and the patient before surgery, marking the surgical site so we make sure we don't do the wrong side. If it's a limb or what part of the spine it is, 11:15:35 we have to mark that, also.

And then, you know -- so we had to be there about an hour before surgery time to do all that stuff. Then you would do your surgery, and in between surgeries I'd have to go out and talk to the families, 11:15:50

Page 55

tell them how things went. I would go to the recovery 11:15:54 room, make sure the patient was doing okay. If I had time before they put the next patient in the room, I would try to dictate the operative note. If I couldn't, I would have to take that home and do it at home. And 11:16:06 just went from patient to patient until you were done with your day. So that was the surgical aspect on Tuesdays and Thursdays.

On Monday, Wednesdays, and Fridays, I would have to make rounds in the morning and -- at the 11:16:23 various hospitals where patients just had surgery and then be to the office by 9:00 to start seeing patients.

In the office we would obviously listen to the patient's complaints if they were new patients. We would try to listen to their history, try to look at 11:16:46 any studies they may have brought in, try to gather a good idea of what they've already tried for their particular problem.

And then depending on what they've already tried or already did, we would recommend 11:17:00 treatment. It could be referral to physical therapy. It could be injections that either I could do in the office; but if they were really invasive injections which means you need X rays and things to do, I would refer them off to injection doctors who would do those 11:17:14

Page 56

special type of testing injections. 11:17:18

And then we would follow up with the patients after that, and we would see how they're doing. If they're not doing well, we may think they're a surgical candidate. We may not. We would give them all 11:17:30 their options.

In between seeing patients in the office, you know, from one patient to the other -- usually, we didn't have much time from one patient to the other; but if there was a few minutes, we would be returning phone 11:17:40 calls. We would be refilling prescriptions on the phone, doing administrative-type stuff like that. And that's what the office was.

The -- I had one -- I had one hour set aside, usually on -- two days a week where I would have 11:17:58 one patient come in for a medicolegal exam. So either on -- either on Monday, Wednesday, or Friday, one of those three days -- two of those three days I'd have one hour set aside at the end of the day where we would have one patient come in for a medicolegal exam. So about 11:18:19 two hours a week would be seeing a patient for a medicolegal exam, and then I would go home.

At home I continue -- that would be the time I'd spend time with my wife. About -- unfortunately, about 30 minutes at the most; and then 11:18:35

Page 57

15 (Pages 54 - 57)

**EXHIBIT 1**

Jeffrey Sabin , M.D. - July 24, 2023

I'd get back to work but now at home. At home I would be doing all the finishing up of all the chart work of all those patients I saw in the office that day if it was an office day. So I had to finish up putting everything into the computer. It's all voice recognition. It's -- it's templates and all these other things that you have to do to -- to document things correctly.

I would call patients back in the evening from my house if there was follow-ups that needed to be done, and then at -- once that was all done -- and that would -- you know, I'd do about -- I think I figured the other day about nine hours a week doing that.

But after that was done -- probably it was sometime after 8:00 o'clock in the evening now -- I would spend a couple of hours doing medicolegal reviews until 11:00 o'clock at night, 11:30 at night and then go to bed.

MR. WARZEL: Steve --

Q. (By Mr. Bressler) I want to go back to --

MR. WARZEL: Hey --

Q. (By Mr. Bressler) You said --

MR. WARZEL: -- Steve, when you reach a good stop, let's take a quick break for -- it's been, like, over an hour, I think.

Page 58

MR. BRESSLER: Okay. Now is fine.

MR. WARZEL: Okay.

THE VIDEOGRAPHER: Going off the record. This is the end of Media Number 1. The time is 11:19 a.m.

(Recess taken from 11:19 a.m. to 11:27 a.m.)

THE VIDEOGRAPHER: We're back on the record. This is the beginning of Media Number 2 in the deposition of Jeffrey Sabin, M.D. The time is 11:27 p.m. -- or a.m.

Q. (By Mr. Bressler) Dr. Sabin, I wanted to go back and follow up on a couple of things you said. First of all, just to make sure I understood you correctly, that you said two days a week at the end of the day you would set aside one hour for a medicolegal exam of a patient?

A. Correct.

Q. And you were talking a bit about some of the treatments that you provided your patients. You mentioned injections, referrals to physical therapy; and I assume medication would be a treatment as well?

A. Yes. Yes. Anti-inflammatories mostly and muscle relaxers. We kind of had a policy against any narcotics unless they were in the postop period.

Q. Okay. Would there be any other in-office

Page 59

procedures that -- that you might perform other than injections?

A. X rays.

Q. Anything else?

A. Not that I can think of right off the bat.

Q. Of your patient population, how many of them ultimate -- well, let me just ask you this: Did you consider yourself a conservative orthopedic surgeon?

A. Yes. I thought very carefully about who would do well with surgery and who would not. Yes.

Q. And what percentage of your patients eventually had surgery with you versus were nonsurgical patients?

A. I would say you had -- I had to see maybe 15 patients before I found someone that I would operate on, you know, right off the bat. Now, I may have been -- not have operated on them right off the bat; but then as I followed them along, I may have -- you know, things would have changed, and they would then turn into a surgical candidate.

But I would say, you know, when they first come into the office, maybe 1 out of 15 I would jump right into surgery. If they were lucky enough -- lucky is not the right word. But if they were -- if

Page 60

they came into the right -- into the office and already had all their studies done and did all the things I required of them -- they already did that, therapy, chiropractic, whatever -- then I would consider the surgery right away. But I would say probably 1 out of 15 before I found a real good surgical candidate.

Q. And I assume that these 15 patients that come to see you might see you on successive dates down the road?

A. Correct.

Q. Out of those patients, how many of them would you estimate on average would become surgical patients?

A. Well, then it -- like I said, then it would narrow down because they would be -- I would be seeing them down the road because they would be participating in things that are necessary to make them a surgical candidate.

They would be completing their physical therapy. They'd be completing their chiropractic. They'd be taking their anti-inflammatories, doing their exercises, having injections, everything they could to avoid surgery. So then it would -- you know, that would narrow it down to, you know, maybe one out of seven or eight, you know, as I continue to follow them.

Page 61

16 (Pages 58 - 61)

EXHIBIT 1

Jeffrey Sabin , M.D. - July 24, 2023

Q. Now, is one of the physicians in the Cornerstone practice Dr. Andrew Castro?

A. Correct.

Q. And is one of the physicians in the Panorama practice Bharat Desai?

A. Correct.

Q. Since you've closed your practice in May of 2021, what jobs or occupations have you held since then?

MR. WARZEL: Object to the form.

Go ahead.

A. I -- I just do the medicolegal reviews and independent medical exams.

Q. (By Mr. Bressler) And earlier you told us that Precision Orthopedics stays in existence, correct?

A. Yes. We kept the name. We did.

Q. And you're still practicing under that name when you do the medicolegal reviews and the independent medical exams?

MR. WARZEL: Object to the form.

A. We're using that as our name for -- for billing and for the people who want to have these type of exams to have a name of -- to where to send things, yes.

Q. (By Mr. Bressler) When you write reports,

Page 66

do you do it on letterhead for Precision Orthopedics?

A. I do.

Q. And before you closed your practice, when you were doing medicolegal reviews and IMEs, were you writing your reports on Precision Orthopedics letterhead?

A. I was.

Q. I'd like to talk a little bit about the disability claim that you submitted to Paul Revere or Unum. Okay?

A. Okay.

Q. How old were you when you submitted the claim to Unum? And I understand you submitted it, if this helps you answer the question, in October of 2020.

A. I have to do math. This will be October of '23. I would have been 64, I think.

Q. Okay. How did you go about submitting the claim?

A. I think I called. I think I got on the phone to see what the -- what the -- what the protocol was, the process was to submit a claim. I think I probably talked to somebody on the phone, and then they probably sent me the paperwork.

Q. Which was my next question. How did you get the claim forms? It sounds like they sent them to

Page 67

you after you called them?

A. I believe -- yeah. Yeah. Because I wouldn't have had the paperwork beforehand. So I would have had to have get it from somebody.

Q. And do you remember what claim forms they sent you?

A. I think kind of like the ones you showed me in the exhibits, from what I recall.

Q. And did you complete those claim forms yourself, or did somebody else complete them?

A. I completed the claim form. I think there was some part of it that I may have had to have the ophthalmology office fill in for any details about what they were seeing; but I made out the form and signed it, I think.

Q. So for the claim forms that call for the claimant to fill out, you completed those, correct?

A. Correct.

Q. And the ones that might have called for the attending physician to complete, you had Dr. Maus complete?

A. Correct.

Q. Oh, wait. Did I pronounce his name correctly?

A. It's actually Maus, like a mouse.

Page 68

Q. Okay.

A. Yeah.

Q. Were you truthful and accurate when you completed the claim forms?

A. I thought I was at the time, yes.

Q. Have you looked back and seen something that you didn't think was truthful or accurate?

A. Yes. So I'd have to look at that again. I think there are some stuff that -- that's not accurate -- are some issues that are not accurate.

Q. Well, one of the things we looked at earlier was the April 5, 2020, date; and you modified that to say March 6 to 8, 2020, correct?

A. Correct.

Q. Is there anything else that you feel needs to be modified or corrected?

A. Can I look at the form? Can you show it to me?

Q. Well, there are three forms. I'd be happy to let you look at all of them. We'll start with the physician questionnaire which is pages -- claim form pages 39 to 43. We'll make that Exhibit 24. Although, Mr. Warzel marked one of these at a deposition he took, and I don't want to mark it twice.

MR. RIVENESS: Mr. Bressler, what is the

Page 69

18 (Pages 66 - 69)

**EXHIBIT 1**

Jeffrey Sabin , M.D. - July 24, 2023

file name for this?                    11:42:13

MR. BRESSLER: It's the claim form pages 39 -- I'm sorry -- claim file pages 39 to 43.

MR. RIVENESS: Do you happen to know what exhibit it may have been marked as?          11:42:43

MR. BRESSLER: It hasn't been marked as an exhibit. It's the -- we'll mark it as Exhibit 24, but it's pages 39 to 43.

MR. RIVENESS: Got it. Thank you.

(Exhibit 24 was marked.)          11:42:58

Q. (By Mr. Bressler) So, Dr. Sabin, this has been pulled up on the screen. At the top it says, "Physician questionnaire." Do you see that?

A. Correct.

Q. And that's your handwriting there?          11:43:17

A. That is my handwriting, yes.

Q. I'll have the concierge scroll through it because you said you wanted to see these forms, and I'll tell you that there's three of them to show you.

A. I don't see anything majorly wrong with          11:44:01 that.

Q. Okay. Let's scroll down further.

A. Yeah. This -- this -- this was a confusing part for me when I made this out. This didn't seem to -- this was -- the part that --          11:44:14

Page 70

Q. Let me stop you and say that you're          11:44:18 looking at, I believe, page -- claim file page 40 and please continue but we want the reader of this transcript to be able to know what document you're talking about. So please continue.          11:44:33

A. Sure. Sure. I'm -- and I'm talking about the very first part where it asks about the average hours that I spent working, and those numbers -- that was confusing because it didn't fit my practice; and those aren't very accurate, the way they look right          11:44:53 there. So I'd like to change that.

Q. How would you change it, sir?

A. Well, if you take everything in consideration, I was looking at that as what I did as an orthopedic surgeon in the office and -- and that is an          11:45:10 even -- still isn't correct because I was -- I was remiss in putting down the amount of work I put in at home when it came to being an orthopedic surgeon and documenting my office and my surgeries. So that got left out. The -- and then --          11:45:31

Q. Okay. Let me stop you. The amount of time you spent at home was left out; is that correct, sir?

A. That was left out.

Q. Okay.          11:45:39

Page 71

A. And then I miscalculated the times I          11:45:39 actually spent in the office with phone calls and prescriptions and things like that. So doing my specific specialty as an orthopedic surgeon would have been, like, about 50 -- you know, about 53, 54 hours a          11:45:52 week and then that --

Q. Encompassing everything?

A. That would encompass everything done at the office and -- yes. And then the off -- then it kind of subdivides it there, goes into the office hours. The          11:46:13 amount would be, like, about 20 -- I would figure, like, 20-plus -- like, 22 hours in the office and then -- and then -- and 21 hours in the hospital on Tuesdays and Thursdays. It would be, you know, ten hours per day, generally, for that.          11:46:33

And then -- then I left out completely anything that I did at home. So for me it would be more accurate -- more informative and more precise to say what I spent doing orthopedic surgery in my office; and then what I did -- what was at home, which was separate,          11:46:55 which would be the medicolegal, that's totally left out.

Q. And how many would you put on that, sir?

A. On the medicolegal?

Q. Yeah. Well, it sounded like you were also doing some follow-up reports at home. So --          11:47:09

Page 72

A. Right.          11:47:13

Q. How much would you spend at home? Like, how many hours at home?

A. About nine hours a week doing the -- finishing up the -- the op notes and the patients'          11:47:21 clinical notes during the -- you know, what I saw in the office. Then at home I would also have spent about 12 hours a week reviewing medicolegal.

Q. For a total of about 21 hours a week at home?          11:47:47

A. No. About 12 hours -- oh, oh. For -- oh, oh. For everything? Yeah. 9 plus 12 would be 21 hours, yeah.

Q. Anything else there before we move on?

A. Yeah. I would like to say that when I          11:48:08 said I spent 20, I actually spent like 24 hours in the -- in the office a week, but two of those hours I already told you -- and I wanted to be absolutely accurate -- that I did set aside one hour twice a week to see a medicolegal patient for an exam. So that's          11:48:29 what cuts it down to 22 hours a week in the office because two of those hours I would apply -- still in the office but, quite honestly, it was to see a medicolegal patient.

Q. Okay. Anything else we need to correct          11:48:45

Page 73

19 (Pages 70 - 73)

EXHIBIT 1

Jeffrey Sabin , M.D. - July 24, 2023

doing the peer review? 12:06:43

A. No. I would like to say they do give me a vest or a shirt or something at the end of the year to say thank you but usually it's got advertising on it for OrthoColorado, but there's no -- there's no monetary. 12:06:56

Q. Are you doing any other work beside -- today besides the medicolegal and the peer review work?

A. No.

Q. Going back to Dr. Desai, does he have any information about -- because you were telling us that he 12:07:16 would be familiar with your surgical practice at the OrthoColorado Hospital and perhaps Lutheran and St. Anthony's, if I remember right?

A. Correct.

Q. Would he have any particular information 12:07:33 about your work that was done at your office location?

A. No. Only -- no, not directly. Only as it pertains -- I mean, it's all connected. So surgery and office is connected, and your surgical indications are based on your office. 12:07:53

So if you are taking a patient to surgery and they don't do well and then they look at it and say, "Well, this patient really didn't need surgery. What were you thinking?" that would -- that would reflect back on your office because that's what you're doing in 12:08:06

Page 86

the office. 12:08:09

So it would -- it would be indirect knowledge of my office by what kind of patients that I brought to the hospital. If I was bringing patients to the hospital that were good surgical candidates, then he 12:08:18 would probably assume that my surgical -- you know, that my office practice was fine; but he wouldn't have any direct knowledge of my office except for how it pertained to bringing patients to surgery.

Q. Does Dr. Desai, to your knowledge, do 12:08:35 medicolegal work?

A. Not that I know of. I mean, he may -- he may do one that I don't -- he may -- he may do one once in a while that I don't know of. I can't say for sure, but I don't -- I think he's pretty busy with 12:08:54 administrative stuff and his own surgical practice.

Q. Are you familiar with CPT codes?

A. Yes.

Q. What is your understanding of what they are? 12:09:05

A. I think they're billing codes.

Q. Used for when you submit bills to third-party payers?

A. Correct.

Q. Like insurance companies? 12:09:19

Page 87

A. Correct. 12:09:20

Q. And in your practice did you have somebody that assigned the billing codes, or did you do that?

A. I would do that. He -- Jim, the office 12:09:32 manager, would -- would kind of turn those in, but he would give me a sheet of paper that had all the common CPTs that we did.

Because he wasn't there in surgery. He would never -- obviously, he wasn't in surgery. So if I 12:09:48 would go to surgery, he would say, "Well, what surgery did you do yesterday?" And I would mark down all the CPTs for all the different parts of the surgery that we did. So I would do the CPTs for the surgeries.

He probably did all the CPTs for, like, 12:10:04 total hips and total knee replacements because those are all the same. They never change. So he would probably do that.

Q. Okay. What about for office visits?

A. The office visits, no. I would do that 12:10:20 because he doesn't know what's going on when you're examining the patient and how much work it's taking for each individual patient. Some are follow-ups. Some are new patients. Some are complicated patients. So there's different codes for each of those. So I would 12:10:35

Page 88

circle that and then just turning it -- turn all that 12:10:38 stack of papers in to him the next day after I dictated it in the -- at home.

Q. Did you have any billings for work actually performed after May 31, 2020? 12:10:46

A. No. I wasn't there to do anything. There could have been, you know, follow-ups or outstanding bills that -- or CPTs that hadn't been filed yet; but I wasn't there and didn't do any work, no.

Q. When did you begin your medicolegal work? 12:11:07

A. It started back in the mid-'90s unintentionally. I was doing all the spine surgery at the Colorado Orthopedic Clinic. The senior partner was doing medicolegal work and he was in the later part of his years and he started doing medicolegal. 12:11:34

And he still had a practice, but he was reviewing X rays one day on a spine case that -- I don't know who sent it to him. Whether it was an attorney or insurance company, I don't recall. But he was looking at it and he was uncomfortable making any comments about 12:11:49 it and he -- he knew I was a spine guy. So he goes, "Well, tell me about this X ray. Tell me about this MRI. What do you see? What do you think?" da, da, da, da, da.

And I would say -- you know, I told him, 12:12:02

Page 89

23 (Pages 86 - 89)

**EXHIBIT 1**

Jeffrey Sabin , M.D. - July 24, 2023

I said, "Well, this is what's going on. Here's the diagnosis. Here's -- here's the issues," you know, whatever.

And he looked at me and he says, "You should do this."

I said, "Well, I'm pretty busy."

He goes, "Well, but we don't have anybody that can comment on spine stuff as well." And he admitted to not being very proficient at it. And I think he called an attorney, and he said, "You should use Dr. Sabin for this case."

And I -- and I -- and I did. And then, boy, after that, I think I saw, you know, a case once every couple, three months; and then it started to build up from there.

Q. Do you remember what year that was?

A. No. It was mid-'90s. You know, probably -- you know, I would say 1993 to 1996, somewhere in there.

Q. Do you have a LinkedIn page?

A. No. I think -- I think I might be signed up for LinkedIn. I think I may have signed up one time. I don't ever visit it. I don't respond to requests for people to join. I don't -- I don't use it at all. So you might find my name on there because -- yeah. So I

Page 90

must have one because people ask me to join, but I never -- I never respond. I don't have one. I don't have one that I utilize.

Q. Okay. I'm going to show you what appears to be a LinkedIn page for you. It's the claim file pages 639 through 640, and we'll mark that as Exhibit 27.

(Exhibit 27 was marked.)

MR. BRESSLER: And scroll down a little bit.

Q. (By Mr. Bressler) This is apparently a LinkedIn page for you. Does this ring a bell to you or look familiar to you?

A. Let me get closer.

MR. BRESSLER: Maybe we could zoom in a little bit on that left column. There we go.

Q. (By Mr. Bressler) It says, "Jeff Sabin, orthopedic spine and joint surgeon at Precision Orthopedics, Littleton, Colorado." Is that -- did I read that correctly?

A. Yes. That's -- that's me. It doesn't ring -- it doesn't ring a bell, but it was probably a long time ago.

Q. All right. And then if we scroll down a little bit more, under "Experience," it says, "Owner,

Page 91

orthopedic surgeon, Precision Orthopedics, October 2005 to the present." Correct so far?

A. Correct.

Q. With the address of 255 Union Boulevard, Number 360, Lakewood, Colorado 80288 -- 80228. Correct so far?

A. Correct.

Q. And then it says, "Sole practitioner, 27 years' experience in spine surgery, joint replacement, and general orthopedics"; is that correct?

A. Correct.

Q. And 25 years' experience in medicolegal exams, IMEs, and medical record reviews; is that correct, too?

A. Correct. Well, I don't know if the years are exactly correct; but that's what it says, yes.

Q. This may be a function of when this was printed out which was a couple of years ago. What in there made you wonder if it was up-to-date?

A. I just don't know if the 25 years correlates with what I told you about starting this in 1993 through '96 or not. I think -- I don't know if that's exact or not.

Q. All right. Does this help refresh your memory that at some point in time you created a LinkedIn

Page 92

page but maybe didn't update it after that?

A. Yes. I never -- I don't think I ever utilized it after that date, whatever date that was created. I don't know.

Q. But it sounds like either patients or medicolegal referrals have come to you and referenced your LinkedIn page to you --

A. I would --

Q. -- correct?

A. I wouldn't know. I don't -- I don't keep track of -- I've never had anybody come to me and said they've found me on LinkedIn. I can tell you that, but I don't know if someone did and just didn't tell me. I don't know.

Q. All right. I may have misunderstood you earlier, sir. I thought you said that people have mentioned your LinkedIn page to you from time to time?

A. No, no, no. What I meant is that still to this day my -- my cell phone will go off and say, "You got a LinkedIn request" to add -- to put my name on someone else's page. So I guess everybody interconnects or something, and I don't respond to any of those.

Q. What type of -- I want to talk a little bit more now about the medicolegal work you do. What type of expert medicolegal work do you do?

Page 93

24 (Pages 90 - 93)

Jeffrey Sabin , M.D. - July 24, 2023

A.  I get requests from both plaintiffs and     12:17:39
the defense.  The majority comes from the defense
because the plaintiffs seem to always have experts
already, you know, their treating physicians.  So the
majority comes from the defense.  Although, there's a     12:17:59
number of firms in town that, again, send me stuff; and
they're plaintiffs' attorneys.

A lot of times it comes through a
third-party entity, someone who puts all the records
together, collects them, does all the billing, does all     12:18:13
the scheduling; and there are a number of those
companies in Denver and some nationally that will send
me stuff.

But most of the -- a great majority comes
out of a company called Integrated Medical Evaluations.     12:18:27
They seem to be the main one in the Denver area.  They
approached me several years ago and said, "We'd like to
put you on our panel of doctors.  We want you to kind of
work for us," and I -- I refused.

So I never did join them.  I don't belong     12:18:48
to any of these groups.  I'm just independent.  I just
do stuff on my own.  So they'll send me either -- the
independent medical evaluations will send me all the
records.

Q.  Could I interrupt you a second?  And I'm     12:19:04

Page 94

going to let you continue --     12:19:06

A.  Sure.

Q.  -- but did I understand you to say that
you never joined Integrated Medical Evaluations?

A.  Correct.     12:19:14

Q.  Okay.  Are you aware that you're actually
listed on one of their pages showing the various experts
they have?

A.  I think they put my name on there and I
brought that to their attention and I never signed     12:19:25
anything to be part of them.  I'm not officially part of
any group.

Q.  Okay.

A.  I guess they can put whoever they want on
there, I guess.     12:19:37

Q.  Okay.  Please continue.

A.  So I kind of forgot -- I forgot what I
was saying.

Q.  Well, you were talking about how cases
come to you often through a third-party entity that     12:19:47
compiles the medical records.  You said you didn't join
them, and I -- I asked you about Integrated Medical
Evaluations.

A.  Sure.  So -- so I'll write -- I'll review
the records.  Well, first, I got to determine what's     12:20:03

Page 95

being asked of me.  Is it just a medical record review?     12:20:06
Is it a medical record review for an IME that's perhaps
going to happen in the future?  You know, what do they
want?

So I prepare the report.  If it's just a     12:20:17
medical record review, I -- I finish that.  I tell them
what's missing, if they're missing questions, if they're
missing the actual imaging studies, if there's records
that I found that I'm missing.  So that will go back and
forth for a while until I get all the records I think     12:20:30
that are needed, and then I finish my report and send it
in.

If it's a medical record review -- I
mean -- excuse me.  If it's an independent medical exam,
I will, again, review the records; but I will hold onto     12:20:42
them until I actually see the patient.  And then I will
travel to wherever I can examine the patient.  A lot of
times these third companies will have office space that
they'll let me use, and I actually pay them rent.  They
say I can use it for nothing, but I don't feel right     12:21:07
doing that because I'm -- again, I'm not part of them.
I don't deserve to get any treatment like that.  So I
pay them hourly for using their space.

And once I see the patient, then I
compile my exam, my interview with the patient with the     12:21:23

Page 96

records I already reviewed and develop an opinion and     12:21:26
then send that in to this third company; and then they
distribute it to the insurance company or to the
attorney or whoever requested.

Q.  And I'm talking about generally these     12:21:46
days, but how many engagements do you have at any given
time?

A.  That's a really hard question to answer
honestly.  The -- with these cases, they tend to get
dragged out.  So there will be a medical record review     12:22:03
and I'll finish it and then they'll send -- I think I'm
done, and they'll send additional records.

So I do a supplement or I do an addendum
or I revise the original report, one of the three, and
then finish it and then more records will come in.  And     12:22:22
then -- then they'll say, "Well, now we want to do an
IME."  And so I got to change the whole thing up again.
So -- so one case can be on your docket for a long time.

I would say currently there's probably
about -- you know, since I'm -- now, since I'm doing     12:22:35
this full-time, I could have, you know, 12 active cases
at any one time.  It's weird because sometimes you'll
think you're done with one, and then six months later
something else will come in on the same -- on the same
claimant, and you thought that case done.     12:22:56

Page 97

25 (Pages 94 - 97)

**EXHIBIT 1**

Jeffrey Sabin , M.D. - July 24, 2023

So it's -- it's really hard to give a number because it just changes. It changes all the time.

Q. How would you compare that with when Precision Orthopedics had an office where you saw patients?

A. Well, it was much more subdued. I mean, literally, I just had two hours a week where I'd see the patient in the office; and then I would -- they would drop off a box -- that was kind of back in the days they were doing boxes of records, and I wasn't doing all electronic. And I would take all these boxes of records home and spend the evenings and the weekends reviewing that.

I kept the practice as the majority of what I did. So I didn't -- I wasn't as active -- I wasn't as active in the medicolegal. I was active, certainly; but I couldn't -- I couldn't devote any more time to it than what I was doing.

So it was about -- 20 percent of my time was spent doing medicolegal when I was -- before my disability compared to 100 percent now of my time is doing medicolegal. So before it was, you know, completely a separate side job I did at home except for those two hours a week when I saw a patient there

Page 98

because that's the most convenient place to see them; but then I kept it pretty separate except for that two hours a week. But, yeah, it's now 100 percent of what I did. So -- so --

Q. Before you -- I'm sorry. Go ahead.

A. So to answer -- so to answer your question, it's much more complicated now. I mean, I've got cases left, right, and, you know, trying to juggle some of them because there's -- there's -- there are more cases now. There definitely are.

Q. Before you closed your doors, what percentage of your revenue was the -- make it what percentage of your income was the medicolegal work?

A. Well, the medicolegal billings was a third. The -- I know Unum has some information they put out that said it was, like, 42 percent or something.

But they had utilized -- they had utilized the COVID year to make that determination which would have been erroneous and not accurate because during the COVID year, we had to shut down for seven weeks. We couldn't do surgery. We couldn't see people in the office, and that was all -- so now, by default, anything I did during those seven weeks was medicolegal because that wasn't shut down. So --

Q. But they reran those numbers after you

Page 99

gave them different information, correct?

A. You are correct. And -- and that brought it down to about one-third. So about one-third of the billings were medicolegal, and two-thirds would have been the combination of office and surgery.

Q. Do you do any workers' compensation medicolegal work?

A. Very rarely. It comes in sporadically as -- if something happens to be related to workers' comp, but I'm not a workers' comp IME doctor. I'm not a division IME doctor. I don't -- I'm not Level II accredited. I don't do impairment ratings for workers' comp or that sort of thing. So I'm not on their panel.

So I would say I'm not a workers' comp independent medical reviewer, but I will say that periodically I'll get one that will come in that they just want to know causation and maybe loosely any restrictions; but it doesn't get formal, like, with impairment ratings and such.

Q. One of the things that your lawyers produced to us was your resume which is at JS 1 through 9, and we'll make that Exhibit -- I think we're on 28 now. Wait for that to come up.

(Exhibit 28 was marked.)

MR. BRESSLER: And if we can go to

Page 100

page -- the very last page.

Q. (By Mr. Bressler) By the way, before we go to the last page, does this -- the top of this, does this look to be your resume or your curriculum vitae, Dr. Sabin?

A. It does.

Q. Okay. Let's go to the last page. And under "Recent conferences," at the top, I believe, it says that you've attended both in 2021 and 2022 the annual AAOS workers' compensation and musculoskeletal injuries course. Do you see that?

A. Correct. I do see that.

Q. And it looks like that's something that you -- and these would have been things that you've attended since closing your practice, correct?

A. Correct.

Q. Was this because you're getting medicolegal work in the workers' comp realm?

A. No. It was -- it would be because I'm doing a lot of it now. It's 100 percent of what I do is medicolegal. So that's why I took this course.

The title there -- you are correct -- talks about workers' compensation but it also had a lot to do with musculoskeletal injuries and that's kind of what I went there for. I sat and listened to the

Page 101

26 (Pages 98 - 101)

**EXHIBIT 1**

Jeffrey Sabin , M.D. - July 24, 2023

would be the -- you know, towards the end of the evening.     13:30:58

Q.  So you say you would really spend some time with it.  How much time would you typically spend preparing such a report?     13:31:05

A.  At least another hour to put the physical exam findings in, to put the history in, to compile the compilation of the discussion, answering the questions.  Sometimes more, sometimes a little less; but most of the time it was about an hour.     13:31:21

Q.  How would you estimate the volume of your medicolegal work since May 31, 2021?  Has it gone up or down?

A.  It's -- since I closed the office, it's gone up.     13:31:43

Q.  By how much?

A.  I seem to still get the same -- it seems like I do actually less IMEs, one to two a week; but there seems to be more medical record reviews.  I would say those -- those probably doubled, the medical record reviews.     13:32:06

And then it seems like there's a -- I don't know if it's something recent or what, but there's a lot more phone conferences.  I mean, attorneys are calling to -- to see what you thought about the records     13:32:18

Page 118

before you send in the report or, "What did you think about the patient?" and this and that.  So seems like there's a lot more phone conferences.     13:32:20

And there's -- it seems like there's lately a lot more additional records coming in that I didn't used to remember getting all these records that were being, you know, not sent in initially; and they're coming in later.  So there's a lot of addendums and supplements, much more than I can remember before I closed the practice.     13:32:31, 13:32:45

Q.  What has been your annual income from your medicolegal work since you closed the practice?

A.  I want to say what we're estimating is about 1 million or so.

Q.  When you say "we're estimating," are you referring to you and your brother Jim?     13:33:08

A.  Yes.  I mean, just taking what we do during the -- you know, a week or a month and multiplying it by so many weeks or months, that's about -- we come up to that figure.     13:33:22

Q.  Is that the income to you, or is that the revenue to Precision Orthopedics?

A.  That's the revenue.  As far as I know, it's the revenue to Precision Orthopedics.  I think that's what it is.     13:33:36

Page 119

Q.  And what's the income to you, the net income out of that?     13:33:37

A.  We just kind of -- we're still figuring that out.  I mean, it was still -- I would say -- I think my last W-2 was -- it still was around 8- or 900-.     13:33:50

Q.  And is there further income to you from Precision beyond the W-2?

A.  Yes.  The K-1.

Q.  And how much is the K-1?

A.  Well, I guess I misspoke.  The W-2 is always about 400,000; and then the other 500- or whatever would be K-1.     13:34:14

Q.  What expenses do you have to satisfy out of the million revenue that you bring in?

A.  The office manager's salary.     13:34:37

Q.  And how -- how much is your brother Jim paid?

A.  About 150-.  And that's about it.  That's -- there's not much overhead.  There's ink and paper, and then he funds -- he funds the -- pays the taxes, funds a -- what do you call it? -- 401 -- not a 401(k) but, you know, the retirement account.     13:34:59

Q.  Do you have any other sources of income besides this money from Precision Orthopedics?

A.  I do have a K-1 out there with a company     13:35:29

Page 120

called Northridge which was an investment for assisted living centers, and that pays -- I don't know -- I don't know what that pays every year.  Probably -- probably a couple thousand dollars every three months or something.     13:35:35

Q.  Any other sources of income?     13:36:05

A.  No.  The -- well, the income from the hospital went away.  No, I don't -- don't.  I don't have any other income.

Q.  Have you applied for Social Security Disability --     13:36:22

A.  No.

Q.  -- Insurance benefits?

A.  No.

Q.  What medications are you taking these days?     13:36:33

A.  I'm taking thyroid medication for hypothyroid; lisinopril, a low dose for minor hypertension; and I'm taking the eye drops for my eyes every day and I'm taking a -- I think it's calcium citrate for kidney stones, to help prevent kidney stones because I tend to want to form kidney stones; and then I take vitamin C and vitamin D.     13:37:00

Q.  What activities do you generally do these days?

A.  Mostly -- I've been limited because of     13:37:25

Page 121

31 (Pages 118 - 121)

**EXHIBIT 1**

Jeffrey Sabin , M.D. - July 24, 2023

same, if not higher right now?

A. Correct.

Q. And you understand that's why they closed your claim, correct?

A. Yes. Whenever we -- we communicated with Unum, we said, "We understand this in regards to residual disability, but that is not our -- our -- our issue here. The issue is full disability."

So they were talking a different animal, and we didn't have any disagreements with that different animal about partial disability.

Q. So recognizing that you feel you should get total disability benefits but focusing on residual disability, you agree that you haven't had a 20 percent loss of income since this point in time of July 2022?

MR. WARZEL: Object to the foundation.

A. Well, I didn't understand the policy to bring income into it. The whole thing was whether I could do my duty as a surgeon or not. I never saw in the policy where income was ever mentioned. So I do disagree with this.

Q. (By Mr. Bressler) Yeah. I think I misspoke, Doctor, and I apologize. I said loss of income. I meant loss of earnings.

You would agree that if we are analyzing

Page 150

this as a residual disability claim, you have not had the requisite loss of earnings since July 2022, correct?

MR. WARZEL: Object to the foundation.

A. I have not had a loss of earnings. I've had a loss of the ability to do the main part of my job.

Q. (By Mr. Bressler) Right. But I'm focusing on the residual disability provision in the disability policy. You would agree that there has not been the requisite 20 percent or more loss of earnings since July 2022, correct?

MR. WARZEL: Object to the foundation.

A. Yeah. When it comes to the residual, I don't have any disagreement.

Q. (By Mr. Bressler) And if you had a disagreement with that, Mr. Waterman's letter to your attorney set forth the procedures by which you could do an appeal, correct?

A. Correct.

Q. And you did not pursue a reevaluation or appeal, did you?

A. No, I did not.

Q. Instead, you filed this lawsuit, correct?

MR. WARZEL: Form.

A. Yes. We have -- we already filed an appeal before this and was not accepted. So we did not

Page 151

file another appeal.

Q. (By Mr. Bressler) You filed an appeal on the issue of whether it should be total disability or residual disability, correct?

A. Correct.

Q. You did not file an appeal or request for reevaluation on whether or not the residual disability claim should be kept open, correct?

A. Correct.

Q. Who is -- we've referred to him a little bit earlier. Who is Dr. Andrew Castro?

A. Dr. Andrew Castro is a spine surgeon and -- was a spine surgeon in Denver. Recently, over the last six months, he has relocated to North Carolina. But he was a colleague of mine who was familiar with my work. I with his. We would refer patients back and forth. If we had questions, if I -- since I was a solo practitioner, if I had any question whatsoever, I would send one to Dr. Castro -- send the information to Dr. Castro to get a second opinion and then -- because I respected him very much.

Then when I closed my practice, I -- my patients would ask me where to go, as you pointed out earlier. I didn't want to direct the patients anywhere particular, but Dr. Castro's group was Cornerstone. So

Page 152

I did include that because they were in the -- in the vicinity of my office as was Panorama. So I gave the patients a choice.

But Dr. Castro was the one who I would often run cases by if I had any questions, and I've read his -- I've seen his work. He does good work, and I respected him very much.

Q. Was he in a practice by himself, or were there others in the practice with him?

A. He was in a large group called Cornerstone Orthopedics. It's -- it was probably 10 or 15 guys.

Q. Did he do medical -- to your knowledge, did he do medicolegal consulting like you?

A. He did. He did. He did -- he was more involved on the workers' comp which I wasn't involved with much but he would do some workers' comp stuff and then he had a very active, you know, surgical practice, also.

Q. Are you aware that he wrote a letter in support of your claim when Mr. Lapuyade was representing you?

A. I believe he did, yes.

Q. Did you ask him to write the letter?

A. I think -- I think, yes, I did. Yes.

Page 153

39 (Pages 150 - 153)

EXHIBIT 1

Jeffrey Sabin , M.D. - July 24, 2023

I, JEFFREY SABIN, M.D., the deponent in the above deposition, do hereby acknowledge that I have read the foregoing transcript of my testimony, and state under oath that it, together with any attached Amendment to Deposition pages, constitutes my sworn testimony.

_____ I have made changes to my deposition.

_____ I have NOT made any changes to my deposition.

_____
JEFFREY SABIN, M.D.

Subscribed and sworn to before me this _____ day of _____, 20_____.

My commission expires: _____.

_____
NOTARY PUBLIC

Page 162

CERTIFICATE OF DEPOSITION OFFICER

STATE OF COLORADO          )

CITY AND COUNTY OF DENVER    )

I, Jessica R. Benson, a Certified Shorthand Reporter within and for the State of Texas and Notary Public within and for the State of Colorado, commissioned to administer oaths, do hereby certify that previous to the commencement of the examination, the witness was duly sworn by me to testify the truth in relation to matters in controversy between the said parties; that the said deposition was taken in stenotype by me at the time and place aforesaid and was thereafter reduced to typewritten form by me; and that the foregoing is a true and correct transcript of my stenotype notes thereof.

That I am not an attorney nor counsel nor in any way connected with any attorney or counsel for any of the parties to said action nor otherwise interested in the outcomes of this action.

My commission expires:  February 22, 2024.

_____
Jessica R. Benson
Certified Shorthand Reporter - TX
Notary Public, State of Colorado

Page 163

42 (Pages 162 - 163)

**EXHIBIT 1**