*Sabin*

*v.*

***The Paul Revere Life Insurance Company***

Jean-Marie Merritt

October 11, 2023



**AB Litigation**
SERVICES

216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

**EXHIBIT 11**

*AB Litigation Services*

Page 61

income coverage in the event that they were unable to perform the duties of their occupation.

Q    Do you have an understanding of whether disability insurance policies are a contract?

A    To my knowledge, yes.

Q    Are contracts important in your opinion?

MR. BRESSLER:  Object to form, lack of foundation.

A    I would think so.

Q    (By Mr. Pulkrabek)  And why are contracts important?

MR. BRESSLER:  Same objections.

A    Because it outlines what is required and -- of the contract of both parties involved.

Q    (By Mr. Pulkrabek)  Do you have an understanding of why an insurance company like Unum sells disability insurance?

A    It's their business.

Q    Why do they do it?

A    For income protection in the event that a claimant is unable to perform the duties of their occupation given a disability or an accident that prevents them from doing so.

Q    Well, what's in it for Unum?

Page 62

A    Nothing.  It's --  I am an employee of the company, and I do my job as defined by the company.

Q    Well, I'm not asking what's in it for you.  I'm just asking what's in it for Unum to sell disability insurance to people, if you know?

MR. BRESSLER:  Objection, lacks found- -- foundation.

A    It's a business.

Q    (By Mr. Pulkrabek)  Do you know someone named Ryan Waterman?

A    I do.

MR. BRESSLER:  Could you repeat that name?  I didn't hear you.  Brian . . .

MR. PULKRABEK:  Ryan Waterman.

MR. BRESSLER:  Oh, Ryan.  I thought you said Brian.

Q    (By Mr. Pulkrabek)  So how long have you known Ryan Waterman?

A    Oh, goodness.  Maybe eight years.  I'm estimating.

Q    You talked a little bit about how Unum's office in Worcester closed a few years ago.  Do you remember that?

A    Yes.

Page 63

Q    But before that, were you working in the office?

A    Yes.

Q    And was Mr. Waterman also working in the same office?

A    Yes.

Q    And where were your offices located relevant to one another?

A    We were in the same building.

Q    Were you on the same floor?

A    Perhaps for a period of time.  People moved around, so we very well could have been on the same floor.

Q    Are you friends with Mr. Waterman?

A    I'm a colleague of his.

Q    Are you on social media together, like on Mr. Waterman's social media site or is he on yours?

A    It's likely.  Likely.

Q    Do you ever go out to lunch with Mr. Waterman?

A    No.

Q    Do you understand who Mr. Waterman reports to?

A    Yes.

Page 64

Q    Who does he report to?

A    Matthew Cartier.

Q    And is Matthew Cartier anywhere in your chain of reporting?

A    No.

Q    I want to go back to orthopedic surgeons for a minute here.  You're -- You're at least familiar with the term "orthopedic surgeon."  We've established that, right?

A    Yes.

Q    Okay.  But you're not able to say in any general sense what the duties of an orthopedic surgeon would be?

A    Correct.  It would be --

Q    And how --

A    -- dependent upon the individual.

Q    So you -- you wouldn't be able to say what the important duties of an orthopedic surgeon are as a general proposition?

A    Correct.

Q    And you're not able to tell me what the important duties of an orthopedic surgeon would be without referring to a specific orthopedic surgeon?

A    Correct.

**EXHIBIT 11**

AB Litigation Services

Page 65

Q    Do you know if a person who has become disabled from performing orthopedic surgery can still be an orthopedic surgeon?

MR. BRESSLER:  Object to form, lack of foundation.

A    Yes, I believe so.  I think that they can provide conservative treatment, x-rays, referrals to occupational therapy or physical therapy.

Q    (By Mr. Pulkrabek)  How important in your opinion is the ability to perform orthopedic surgery to the occupation of being an orthopedic surgeon?

MR. BRESSLER:  Object to form, lack of foundation.

A    That's a general statement.  What I can say is that as part of my responsibility, I look at duties.  And in the duties in the case of Dr. Sabin, one of the important duties of his occupation was surgery in addition to medical and legal reviews.

Q    (By Mr. Pulkrabek)  And do you agree that performing orthopedic surgery is one of the important duties of being an orthopedic surgeon as a general proposition?

Page 66

MR. BRESSLER:  Object to form and foundation.

A    It is an important -- one of the important duties, yes.

Q    (By Mr. Pulkrabek)  Do you know any orthopedic surgeons who are unable to perform orthopedic surgery?

A    Again, that's a general statement.  Are you talking about do I know anyone personally?

Q    Sure.  Do you know anyone personally who's an orthopedic surgeon who cannot perform orthopedic surgery?

A    I don't think I even know an orthopedic surgeon.

Q    If you needed orthopedic surgery itself, would you go to an orthopedic surgeon who couldn't perform orthopedic surgery?

A    Yes.

Q    Why would you go see an orthopedic surgeon who couldn't perform surgery if you needed surgery?

A    I think a consult- --

Q    Explain that.

A    -- consultation.  I would --  I don't think I would go to an orthopedic surgeon with the

Page 67

intent of "Let's schedule surgery now."  I think I want to get an opinion and start with conservative treatment before going under a knife.

Q    Do you have any understanding of what duties are at the heart of being an orthopedic surgeon as a general proposition?

MR. BRESSLER:  Object to form and foundation.

A    Again, generally I can't answer that.  Every practice is different.  Every doctor, every orthopedic surgeon is different.  It can't be defined specifically in general.

Q    (By Mr. Pulkrabek)  It's impossible to define in general what an orthopedic surgeon is in your opinion?

A    Yes.  It depends upon the practice.

Q    And in working at Unum, do you work with other vocational rehabilitation consultants?

A    I do.

Q    Do you know whether you are alone at Unum among the vocational rehabilitation consultants with respect to your view that you couldn't define what the duties of an orthopedic surgeon are as a general proposition?

A    I can't answer for other people.

Page 68

Q    Do you agree that the ability to perform orthopedic surgery is at the heart of being an orthopedic surgeon?

MR. BRESSLER:  Object to form and foundation.

A    It could be one of the important duties, but not the only duty.  There are other things that can be done.  Again, as I mentioned, conservative treatment, office visits, referrals for physical therapy, amongst other duties, as Dr. Sabin did with medical-legal reviews.

Q    (By Mr. Pulkrabek)  My --  My question is just as a general proposition, do you agree that performing orthopedic surgery is at the center of what it means to be an orthopedic surgeon?

MR. BRESSLER:  Object to form and foundation.

A    I can't answer that question, because I -- I specifically look at the duties, not a job title.

Q    (By Mr. Pulkrabek)  Do you agree that one of the fundamental duties of an orthopedic surgeon is performing orthopedic surgery?

MR. BRESSLER:  Same objections, form

EXHIBIT 11

**AB Litigation Services**

Page 69

and foundation.

A    Again, I am not looking at a job title. I'm looking at specific duties for specific claimants.

Q    (By Mr. Pulkrabek) All right. So you're unable to tell me one way or the other whether performing orthopedic surgery is fundamental to being an orthopedic surgeon.

Is that fair?

MR. BRESSLER: Object to form.

A    I would think so. I -- I still --

THE DEPONENT: I'm sorry. Is someone talking?

MR. BRESSLER: No. Please finish your answer.

THE DEPONENT: Oh, okay. I apologize.

A    I believe that I would need to look at the duties, not just the job title to see what those duties entailed.

Q    (By Mr. Pulkrabek) All right. I'm going to ask you a couple questions as a vocational rehabilitation consultant. If you're not able to answer them, you can say that.

So I want to take a scale from zero to 10 where zero is totally unimportant to the job,

Page 70

10 is the most important thing to the job, okay?

A    Okay.

Q    On that scale from zero to 10, how important to the job of an orthopedic surgeon is it to be able to perform orthopedic surgery?

MR. BRESSLER: Object to form and foundation.

A    That's too general a question. I have to look at not just the job title. I'm looking at the job duties.

Q    (By Mr. Pulkrabek) All right. So you're unable to say on a scale from zero to 10 how important it would be for an orthopedic surgeon to be able to perform orthopedic surgery as a general proposition?

MR. BRESSLER: Same objections, and asked and answered.

A    Right. It would be what I just answered.

Q    (By Mr. Pulkrabek) On the same scale from zero to 10, can you say how important it is to the job of being an orthopedic surgeon that that orthopedic surgeon -- that an orthopedic surgeon also does medical-legal work?

MR. BRESSLER: Same objections.

Page 71

A    Again, I would have to say I'm not looking at the job title. I'm looking at the job duties, and that will vary from individual to individual. So it could vary.

Q    (By Mr. Pulkrabek) Okay. Just within the same framework, on a scale from zero to 10, how important is it to the job of being a taxicab driver to be able to design spacecraft that gets sent to Mars?

MR. BRESSLER: Same objections.

A    I'm not -- Again, I'm not looking at a job title. I'm looking at job duties. And although it may sound unusual for that job title to do those job duties, it's not -- I would still have to look at the individual to see what they're doing.

Q    (By Mr. Pulkrabek) Do you know if it's possible for somebody to be a taxicab driver without designing spacecraft that flies to Mars?

A    Sure. I would think so.

Q    Okay. Do you know if it's possible for an orthopedic surgeon to be an orthopedic surgeon without doing medical-legal work?

A    Yes. I would think it's possible.

Q    What, if anything, did you do to

Page 72

determine, while working on Dr. Sabin's claim, how important medical-legal work would be to the job of being an orthopedic surgeon?

MR. BRESSLER: Object to form, lack of foundation.

A    I looked at the claim form -- at the claim file, excuse me, that included initial claim forms, telephone calls with Mr. Waterman, other phone calls throughout the claim, an occupation description form completed by Dr. Sabin, a physician questionnaire completed by Dr. Sabin, medical licensing and CPT production reports, and I took all of that into consideration.

Q    (By Mr. Pulkrabek) And did you do any research, whether through the Dictionary of Occupational Titles or O*NET or on the Internet or anywhere else, to determine whether doing medical-legal work is part of being an orthopedic surgeon as defined by those resources?

A    Well, I would have used the Enhanced Dictionary of Occupational Titles. In this case, I did not. There was information in the file that was sufficient and that also hinged upon the definition of occupation in Dr. Sabin's policy.

Q    Did you -- Did you do any research

*Jean-Marie Merritt - 10/11/2023*

**EXHIBIT 11**

Page 77

I'm -- I'm just really looking for a did you do it or did you not do it, not a what did you do, okay?

So my question is, in working on Dr. Sabin's claim, did you consider how the occupation of an orthopedic surgeon is generally performed as described by the vocational resources such as O*NET and eDOT?

A    I would not have used those resources based on his policy definition.

Q    So the answer is no, you didn't, right?

A    No, I would not have.  That would not have been necessary.

Q    So can you tell me the information -- I know you said the file, but what information did you actually consider as part of your work on Dr. Sabin's claim?

A    I look at the -- the policy definition of occupation.  I look at the initial telephone call with the benefit specialist, whom I believe was Ryan Waterman in this case.  I look at telephone calls throughout the claim, an occupation description form completed by Dr. Sabin.  There's a physician questionnaire Dr. Sabin also completed.  I look at occupational research that is in the file from data research,

Page 78

which includes a medical license.  I look at CPT production reports.

Q    One of the things you mentioned was the policy's definition of occupation.  How did the policy define occupation?

A    I believe, and not to quote me on this, there are many definitions, but it was the occupation or occupations performed preceding the date of disability, something to that effect.

MR. BRESSLER:  Just -- Ross, just so the record is clear, she doesn't have any of the file documentation in front of her.  And I gather you're just wanting to gauge her understanding, but I just wanted the record to be clear that she's not actually looking at any of the documents, such as the policy.

MR. PULKRABEK:  Well, I think that was quite clear from her testimony that she wasn't reading.  Okay.

Q    (By Mr. Pulkrabek)  What did you learn, if anything, about Dr. Sabin's education in working on his claim?

A    I don't recall specifically.  I know he went to medical school -- I don't recall where -- with training in orthopedics, orthopedic surgery.

Page 79

Again, I don't recall where.

Q    All right.  Do you -- Do you -- Did you know when he got his degree?

A    I don't recall.

Q    What -- Was Dr. Sabin's education a factor at all in how you evaluated his claim?

A    Yes, it is, because it speaks to his credentials to perform his occupational duties.

Q    Okay.  Is it -- Is -- And I didn't see that you specifically referred to his education as something you considered.  So how did that -- how did that factor into the work that you did exactly?

A    It may not have been documented, but I think along with the medical license -- You know, you can't have a medical license unless you -- unless you have a medical degree.  So that is sufficient credentials for me to understand his education.  And his education may even have been on the medical license.

Excuse me.  I apologize.

Q    Fair.  Do you know if Dr. Sabin did a residency?

A    I'm sure he did.  I don't know where.

Q    Okay.  Did you -- Do you know what

Page 80

field his residency was in?

A    I don't recall, but I'm sure it must have been in orthopedics.

Q    Do you know if Dr. Sabin had a fellowship?

A    I don't recall.

Q    So did you factor whether or not he had a fellowship into your evaluation or analysis?

A    I don't recall looking into that.

Q    Did you -- Do you know if Dr. Sabin held any board certifications?

A    Huh.  That may have been in the file.  It may even have been on the licensing report.  I don't recall.

Q    Can you say whether or not it was a factor that you considered in the work that you did on Dr. Sabin's claim?

A    No.  It likely would not have been.

Q    Okay.  Did you learn whether Dr. Sabin was a member or fellow of any medical associations or academies, societies, other organizations as part of the work that you did on his claim?

A    It may be in the file.  It may -- Again, it may be referenced on his medical license that is imaged in the file.  I don't recall

**EXHIBIT 11**

**AB Litigation Services**

Page 81

specifically.

Q    Okay.  Did it -- Did that information factor into your analysis when you were working on Dr. Sabin's claim?

A    Well, I focus on duties, so I'm looking specifically at the duties that he performed, not necessarily board certifications or memberships.

Q    Do you know if Dr. Sabin served on any peer review committees?

A    I don't recall.

Q    And do you -- do you recall whether it was a factor that you considered at all in the work that you did on his claim?

A    Again, I would have focused on the duties that he performed, not necessarily any -- any other extracurricular work or activities.

Q    Do you have an understanding of whether what you just referred to as extracurricular work or activities is important to an orthopedic surgeon professionally?

A    I think it's up to the individual.

Q    Okay.  Do -- Do you have -- Do you actually have an understanding of it beyond saying it's up to the individual, or no?

A    Well, it depends upon the role of the

Page 82

individual, what they're doing, where they're at in their career.  There are a number of factors that would play into that.

Q    Did you ever interview Dr. Sabin and get any more information about him?

A    I'm sorry.  Can you say that again?

Q    Sure.  Did you interview Dr. Sabin to get more information about him?

A    I did not.

Q    Did you ever ask him any questions by e-mail?

A    No, but that would have been done by Mr. Waterman.

Q    Did you ever interview anybody else about Dr. Sabin's claim?

A    I don't believe so.

Q    I've seen documents -- and we'll look at some of them in a little bit -- where Dr. -- where Ryan Waterman asked you to answer some questions.  Do you recall those -- those times when Mr. Waterman asked you to answer some questions about Dr. Sabin?

A    Yes.

Q    Okay.  But was there ever a time when you asked Mr. Waterman to get more information?

Page 83

A    I very well could have.

Q    Well, do you remember doing that?

A    I believe that I made recommendations. It's not for me to determine whether to get the information or not.  It is my suggestion to the claims personnel that I suggest if more information is needed or what they could get, and then it would be up to them to determine whether it is necessary or not.

Q    Okay.  What, if any, information do you believe -- do you recall recommending Mr. Waterman obtain from -- or related to Dr. Sabin's claim?

A    Specifically --  I don't recall specifically, but I likely requested CPT reports.

Q    Anything other than CPT reports?

A    Perhaps the medical license.

Q    Okay.  Anything else?

A    I don't recall.

Q    I want to talk a little bit about CPT codes, if we can.  From my notes here --  What is a CPT code, if you know?

A    It is Current Procedural Terminology.

Q    Okay.  And does that apply to a particular field or area?

A    It applies to medicine.

Page 84

Q    Okay.  So I saw in respect to Dr. Sabin's claim that you asked other people within Unum's organization to crunch the CPT code data and then provide you with reports.

Do you recall doing that?

A    Yes.

Q    Okay.  Do you ever personally crunch the CPT codes yourself?

A    I will do on occasion.

Q    Like, when's the last time you did it?

A    Wow, I don't recall.

Q    Have you done it at any time since you worked on Dr. Sabin's claim?

A    I probably did.

Q    All right.  Is there a -- a procedure that you're aware of for how to analyze CPT codes like was done in Dr. Sabin's claim?

A    I'm not sure if it's a procedure.  It's a process.

Q    All right.  Is there any written description of the process that one goes through in order to do a CPT code analysis?

A    I don't know.

Q    And you've never seen one?

A    I don't believe so.

**EXHIBIT 11**

*AB Litigation Services*

**Page 185**

STATE OF COLORADO)

)ss.    REPORTER'S CERTIFICATE

COUNTY OF DENVER )

I, Tracy L. Harris, do hereby certify that I am a Certified Realtime Reporter, Registered Merit Reporter, within the State of Colorado; that previous to the commencement of the examination, the deponent was duly sworn to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth, that it was thereafter reduced to typewritten form, and that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

In witness whereof, I have affixed my signature this 16th day of October, 2023.

Tracy L. Harris, CRR, RMR, RPR

216 - 16th Street, Suite 600

Denver, Colorado 80202

**Page 186**

AB LITIGATION SERVICES
216 - 16th Street, Suite 600
Denver, Colorado  80202
October 20, 2023
LEWIS ROCA ROTHGERBER CHRISTIE, LLP
Stephen M. Bressler, Esq.
201 East Washington Street, Suite 1200
Phoenix, Arizona  85004

Re:  Deposition of JEAN-MARIE MERRITT
     Sabin vs. Paul Revere Life Ins. Company
     Civil Action No. 1:23-CV-00236-DDD-KLM

The aforementioned deposition is ready for reading and signing.  Please attend to this matter by following BOTH of the items indicated below:

_____ Call 303-296-0017 and arrange with us to read and sign the deposition in our office

_XXX_ Have the deponent read your copy and sign the signature page and amendment sheets, if applicable; the signature page is attached

_____ Read the enclosed copy of the deposition and sign the signature page and amendment sheets, if applicable; the signature page is attached

_XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER

_____ By _____ due to a trial date of _____

Please be sure the original signature page and amendment sheets, if any, are SIGNED BEFORE A NOTARY PUBLIC and returned to AB Litigation Services for filing with the original deposition. A copy of these changes should also be forwarded to counsel  of record.  Thank you.
AB LITIGATION SERVICES
cc:  All Counsel

**Page 187**

AB LITIGATION SERVICES
216 - 16th Street, Suite 600
Denver, Colorado  80202

JEAN-MARIE MERRITT
October 11, 2023
Sabin vs. Paul Revere Life Ins. Company
Civil Action No. 1:23-CV-00236-DDD-KLM

The original deposition was filed with Ross W. Pulkrabek, Esq., on approximately the 16th day of October, 2023.
_____ Signature waived
_____ Signature not requested
_____ Unsigned; signed signature page and amendment sheets, if any, to be filed at trial
_XXX_ Unsigned; original amendment sheets and/or signature pages should be forwarded to AB Litigation Services to be filed in the envelope attached to the sealed original.

Thank you.

AB LITIGATION SERVICES

cc:  All Counsel

**Page 188**

Deposition of JEAN-MARIE MERRITT

October 11, 2023

Sabin vs. Paul Revere Life Ins. Company

Civil Action No. 1:23-CV-00236-DDD-KLM

The deponent wishes to make the following changes

in the testimony as originally given:

| Page | Line | Should Read | Reason |
|------|------|-------------|--------|
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |

Signature of Deponent: _____

Acknowledged before me this ____ day of _____,

20___.

(Seal)     Notary's signature _____

My Commission expires _____

**EXHIBIT 11**