## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No. 1:23-cv-00236-DDD-KLM

JEFFREY SABIN, M.D.,

      Plaintiff,

v.

THE PAUL REVERE LIFE INSURANCE COMPANY and UNUM GROUP,

      Defendants.

---

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND FOR DETERMINATIONS AS A MATTER OF LAW (DOC. 35)

---

Plaintiff, Jeffrey Sabin, M.D., responds to Defendant's Motion for Summary Judgment and for Determinations as a Matter of Law (Doc. 35), as follows:

### INTRODUCTION

The evidence presents disputed issues of material fact. Dr. Sabin's "occupation" was that of an orthopedic surgeon. The medical-legal work he performed on the side neither qualified as his "occupation," nor a "duty" of his occupation. Alternatively, the Policy's definition of "total disability" is ambiguous and must be construed in Dr. Sabin's favor.

Contrary to Defendants' argument that Dr. Sabin's vision loss was caused by "sickness," Dr. Maus (Dr. Sabin's treating ophthalmologist) will testify that the damage was caused by a combination of "sickness" (viral conjunctivitis) and "injury" (side effects from surgeries). Consequently, the monthly benefit is $15,000, not $1,508.

Regarding the bad faith claims, the evidence shows that Defendants misused the condemned practice of "CPT code analysis" to misclassify Dr. Sabin's occupation so it could deny his disability claim. Defendants ignored the procedures in their own claim manual, and disregarded prior court decisions against them and regulatory admonishments that prohibit such conduct.

Finally, Defendants' argument that "two times the covered benefit" under C.R.S. § 10-3-1116 applies only to "past due benefits" contradicts the plain language of the statute.

**RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.      Denied in part. Dr. Sabin was an orthopedic surgeon. He did not treat patients outside his area of specialty. **Ex. A**, at 31:25-32:5; 55:1-57:13; **Ex. B**, at 1, 4.[1]

2.      Denied. Medical-legal work is not a "duty" of an orthopedic surgeon. *Id.* at 52:13-53:25; 73:25-74:21; 98:4-99:10; **Ex. C**, at 10-11, Interrogatory 7; **Ex. D**, at 2,-3; **Ex. B**, at 4-5.[2]

3.      Admitted.

4.      Admitted.

5.      Denied. Dr. Sabin's medical-legal work was done on the side, mostly performed at home, at night and on the weekends. **Ex. A**, at 98:4-99:10; 72:7-21; 73:2-8; 58:14-18; 110:8-23; **Ex. B**, at 6.

6.      Denied. Dr. Sabin spent about 54 hours working "in the office," including surgical rounds. He worked an additional nine hours per week at home "finishing up the … op

---

[1] The Declaration of Zachary Warzel, authenticating exhibits, is attached as **Exhibit X**.

[2] **Exhibits D**, **G**, and **K** are expert reports/summaries. Declarations from these experts authenticating their opinions are appended at the end of each such exhibit.

notes and the patients' clinical notes. . . ." **Ex. A** at 72:1-73:8; **Ex. B**, at 6. This totals 63 hours

per week as an orthopedic surgeon.

7.      Denied in part. On the low end, 14 hours per week of medical-legal work is

approximately 18% of Dr. Sabin's total time. **Ex. A**, at 72:1-73:8; **Ex. B**, at 6.

8.      Denied. In 2016-2017, medical-legal work accounted for 23.4% of charges; in

2017-2018, it was 33.61%; and in 2018-2019, it was 32.74%. **Ex. E**, at 1; **Ex. F**, at 6.

9.      Denied in part. Dr. Sabin's vision loss was not caused solely by glaucoma, but

also by viral conjunctivitis (causing cataracts), necessitating six surgeries, the side effects of

which contributed to the net damage. **Ex. C**, at 7, Interrogatory 5; **Ex. G**, at 5-11; **Ex. B**, at 2.

10-16. Admitted.

17.     Denied. The monthly benefit is $15,080 for all claims, whether sickness or injury

related, to age 65. **Def. Ex. 6**, at 177.[3] It is only "after age 65" that the Lifetime rider applies. *Id.*

at 196.

18.     Denied. *See* response to 17, above.

19.     Denied. *See* response to 17, above. For claims submitted at age 64 (as here),

whether based on "injury" or "sickness," or both, "30 months" of benefits are paid at the rate of

$15,080 per month before the Lifetime rider applies. *Id.* at 179; **Ex. H**, at 109:25-111:8.

20.     Admitted.

21.     Denied. The Policy defines residual disability as follows:

---

[3] Citations to **Def. Ex. 6** are to the last three digits of the Bates designation; *e.g.,* the above citation is to Bates No.
PRL-CL-IDI-000177.

1.11 **"Residual Disability"**, prior to the Commencement Date, means that due to Injury or Sickness which begins prior to age 65:

    a. (1) You are unable to perform one or more of the important duties of Your Occupation; or
       (2) You are unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them; and
    b. You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further care would be of no benefit to You; and
    c. You are not Totally Disabled.

As of the first Commencement Date to occur, Residual Disability means that due to the continuation of that Injury or Sickness:

    a. You incur a Loss of Earnings while You are engaged in Your Occupation or another occupation; and
    b. You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further care would be of no benefit to You; and
    c. You are not Totally Disabled.

Residual Disability must follow right after a period of Total Disability that lasts at least as long as the Qualification Period, if any. This period is shown on the Policy Schedule.

**Def. Ex. 6**, at 182.

22.    Admitted.

23.    Denied.  Residual disability works as follows:

## 2.2    RESIDUAL DISABILITY BENEFIT

We will periodically pay a Residual Disability benefit during Your Residual Disability.

The monthly amount We will pay equals:

$$\frac{\text{Loss of Earnings}}{\text{Prior Earnings}} \quad X \quad \text{Maximum Monthly Amount}$$

During any Disability each of the first 6 monthly payments of this benefit will not be less than 50% of the Maximum Monthly Amount.

The benefit will begin on either the Commencement Date or the day after Your Total Disability ends, if later. We will pay this benefit while Your Residual Disability continues, but not beyond the Maximum Benefit Period. For periods of less than a month, We will pay 1/30th of the benefit for each day of Residual Disability.

"**Loss of Earnings**" for any month means Your Prior Earnings minus Your Monthly Earnings for the month for which a benefit is claimed. This difference will be considered Loss of Earnings to the extent it is due to the Injury or Sickness which caused the Disability. The Loss of Earnings must be at least 20% of Prior Earnings.

If the Loss of Earnings for any month is 75% or more of Prior Earnings, We will deem the loss to be 100% of Prior Earnings.

"**Prior Earnings**" means the greater of:

> a.    Your average Monthly Earnings for the year just before Your Disability began; or
> b.    Your highest average Monthly Earnings for any 2 successive years during the 5 year period just before Your Disability began.

Starting as of the first Review Date, We will make an inflation adjustment to Your Prior Earnings. We will multiply Your Prior Earnings by the CPI Factor. The result will be used until the next Review Date to compute Residual Disability benefit amounts payable. However, the inflation adjustment increase will be at least 7% of Your Prior Earnings amount.

The inflation adjustment will not apply once the Disability ends. But it will apply to recurrent Disability deemed continuing under the Recurrent Disability section of Your Policy.

"CPI" means the Consumer Price Index for All Urban Consumers. It is published by the United States Department of Labor. If this index is discontinued or if the method for computing it is materially changed, We may choose another index. We will choose an index which in Our opinion would most accurately reflect the rate of change in the cost of living in the United States. CPI will then mean the index We chose.

"Review Date" means the date that occurs:

    a. After each successive 12 months of Disability; and
    b. While Your Disability continues.

No Review Date will occur on or after Your 65th birthday.

"Index Month" means the calendar month four months prior to the calendar month in which a Review Date occurs. But the first Index Month for any Disability will be the calendar month 4 months prior to the month in which Your Disability began.

"CPI Change" means the result of a computation We will make as of each Review Date. We will divide the CPI for the most recent Index Month by the CPI for the Index Month prior to the most recent Index Month.

"CPI Factor" means the result of the CPI Change as of the current Review Date multiplied by the CPI Change for each prior Review Date occurring since the Disability began. The CPI Factor as of the first Review Date will equal the CPI Change as of that Review Date. A CPI Factor is determined as of each Review Date while Disability continues.

"Monthly Earnings" means Your salary, wages, commissions, bonuses, fees, and income earned for services performed. If You own any portion of a business or profession, it means:

    a. Your share of the income earned by that business or profession;
    b. Less Your share of business expenses which are deductible for Federal income tax purposes;
    c. Plus Your salary and any contributions to a pension or profit sharing plan made on Your behalf.

Monthly Earnings does not include:

    a. Income from deferred compensation plans, disability income policies, or retirement plans; or
    b. Income not derived from Your vocational activities.

We will allow either the cash or accrual accounting method. But during a Disability the same method must be used when determining Loss of Earnings.

**Def. Ex. 6**, at 183-84.

24-26. Admitted.

27.     Denied.  Dr. Sabin's eye surgeon, Dr. Maus, will testify that the vision loss was caused by viral conjunctivitis, which increased eye pressures (glaucoma), leading to cataracts, necessitating six surgeries, the side effects of which contribute to the net damage. **Ex. C**, at 7, Interrogatory 5; **Ex. G**, at 5-11; **Ex. B**, at 2.

28.     Denied as to Defendant's characterization of the records' "consistency."

29-30. Admitted.

31.     Denied that Defendant gave these various materials equal (if any) weight. Defendants focused primarily on CPT analysis. **Ex. H**, at 38:16-20; 44:20-45:3; 56:7-15; 58:3-24; 62:4-25; 67:5-12; 72:12-18; **Ex. I**, at 19:18-20:5; 41:4-14; 43:11-44:25; 75:9-18; **Ex. J**, at 83:10-18; **Ex. K**, at 17, 24-25, 27, 34[4]; **Ex. L**, at 57:2-13; 62:19-63:5; **Ex. M**, at 1-2; **Ex. N**, at 1-2; **Ex. O**, at 3-4.

32.     *See* response to 31, above.

33.     Admitted.

34.     Denied that Defendants "consider[ed] the duties Plaintiff actually performed. . . ." Defendant focused primarily on CPT analysis. **Ex. H**, at 38:16-20; 44:20-45:3; 56:7-15; 58:3-24; 62:4-25; 67:5-12; 72:12-18; **Ex. I**, at 19:18-20:5; 41:4-14; 43:11-44:25; 75:9-18; **Ex. J**, at 83:10-18; **Ex. K**, at 17, 24-25, 27, 34; **Ex. L**, at 57:2-13; 62:19-63:5.  Admitted that Defendant did not consider Plaintiff's job title or the duties orthopedic surgeons generally perform.

35.     Denied in part.  Denied that this "support[ed] [Defendants'] conclusion that medical / legal reviews were an important duty. . . ." **Ex. A**, at 52:13-53:25; 58:14-18; 72:7-21; 73:2-8; 73:25-74:21; 98:4-99:10; 110:8-23; **Ex. C**, at 10-11, Interrogatory 7; **Ex. D**.

---

[4] Citations to **Exhibit K** are to the Bates number; *e.g.* citation to page 17 refers to Bates No. EXP LBP 0017.

36-37.    Admitted.

38.    Denied in part.  Dr. Sabin did not "request" that Defendants analyze CPT codes.

**Ex. H**, at 38:16-20; 44:20-45:3; 56:7-15; 58:3-24; 62:4-25; 67:5-12; 72:12-18; **Ex. I**, at 19:18-20:5; 41:4-14; 43:11-44:25; 75:9-18; **Ex. J**, at 83:10-18; **Ex. K**, at 17, 24-25, 34; **Ex. L**, at 57:2-13; 62:19-63:5.  After realizing Defendants' analysis was based on flawed data, Dr. Sabin provided additional pre-pandemic codes. **Ex. H**, at 35:21-36:3; 50:17-54:14.  Admitted that Defendants determined medical-legal reviews accounted for 37% of total charges.  Denied that this review "confirmed" medical-legal reviews were an "important duty." **Ex. E**; **Ex. F**, at 6.

39-41.    Admitted.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

**Dr. Sabin's Loss of Vision**

1.    Prior to disability, Dr. Sabin suffered from glaucoma that was stable. **Ex. B**, at 1; **Ex. G**, at 5-6.

2.    In March 2020, Dr. Sabin contracted an eye infection thought to be Covid related. *Id.* at 6; **Ex. A**, at 44:17-46:12; **Ex. B**, at 1.

3.    This infection greatly elevated Dr. Sabin's internal eye pressures. **Ex. B**, at 1-2; **Ex. G**, at 6.

4.    Dr. Sabin developed cataracts due to inflammation. *Id.*

5.    Dr. Maus determined that Dr. Sabin needed surgery to implant drain shunts. *Id.*

6.    The drain tube inserted into Dr. Sabin's left eye failed to open properly, and a revision surgery was required. *Id.*

7.      The multiple surgeries, and prolonged inflammation, exacerbated the cataracts, which required lens replacements. *Id.* at 7, 10.

8.      In all, Dr. Sabin underwent six surgical procedures. *Id.*

9.      The surgeries and inflammation caused permanent scarring to his eyes. *Id.* at 10; **Ex. A**, at 75:11-76:25.

10.     As a result of the eye infection, prolonged inflammation, and side effects from surgeries, Dr. Sabin has permanent vision loss. **Ex. G**, at 10-11; **Ex. A**, at 75:11-76:25; **Ex. B**, at 2.

**Dr. Sabin's Occupation**

11.     Dr. Sabin was a board-certified orthopedic surgeon, specializing in spine surgery. **Ex. A**, at 17:4-12; 19:9-23; 22:18-20; 92:8-11; **Ex. B**, at 1-2.

12.     Dr. Sabin's office work in his medical practice revolved around his surgical duties. **Ex. A**, at 36:11-39:10; 52:13-21; 60:12-61:25; 86:17-20; 128:9-20; 157:17-24; **Ex. C**, at 10-12, Interrogatory 7; **Ex. B**, at 4-5.

13.     All duties of an orthopedic surgeon sit under the overarching duty of "surgery." **Ex. A**, at 36:11-39:10; 52:13-21; 60:12-61:25; 86:17-20; 128:9-20; 157:17-24; **Ex. C**, at 10-12, Interrogatory 7; **Ex. B**, at 4-5.

14.     An orthopedic surgeon's practice, without the ability to perform surgeries, is not sustainable. **Ex. A**, at 38:16-39:10; **Ex. D**, at 3; **Ex. B**, at 5.

15.     Due to vision loss, Dr. Sabin stopped performing surgeries in July 2020. **Ex. A**, at 36:11-37:3; **Ex. B**, at 5.

16.     Dr. Sabin closed his medical practice on May 31, 2021 as a result. **Ex. A**, at 25:11-17; 62:1-3; **Ex. C**, at 12, Interrogatory 7; **Ex. P**, at 4, ¶ 27; **Ex. B**, at 5.

**Dr. Sabin's Medical-Legal Side Work**

17.     Pre-disability, Dr. Sabin's reputation led lawyers and insurers to retain him as an expert witness. **Ex. A**, at 93:23-94:24; 98:4-99:10; **Ex. D**, at 2; **Ex. Q**; **Ex. R**, at 2; **Ex. B**, at 6.

18.     The vast majority of Dr. Sabin's medical-legal work was conducted after hours, at home, and on weekends. **Ex. A**, at 57:14-58:18; 71:13-74:4; 98:4-99:4; **Ex. B**, at 6.

19.     Pre-disability, he spent approximately 14 hours per week (18% of his time) on medical-legal work. **Ex. A**, at 71:13-74:4; **Ex. B**, at 6.

20.     Medical-legal work is not a "duty" of being an orthopedic surgeon. **Ex. C**, at 10-12, Interrogatory 7; **Ex. D**, at 2-3; **Ex. H**, at 130:23-131:3; **Ex. I**; at 29:22-30:1; **Ex. J**, at 71:21-24; **Ex. B**, at 4-5.

21.     While Dr. Sabin's medical-legal work was lucrative (approximately 30% of charges), it was not his vocation; it was separate and apart from his occupation as a spine surgeon. **Ex. A**, at 52:17-53:25; 72:16-21; 74:12-17; 98:4-99:4; 128:9-16; **Ex. C**, at 10-12, Interrogatory 7; **Ex. D**, at 2-3; **Ex. B**, at 6.

22.     Medical-legal work does not involve patient treatment. **Ex. A**, at 8:22-25; 64:13-21; 94:1-7; **Ex. D**, at 2; **Ex. B**, at 6.

**The Paul Revere Policy**

23.     Dr. Sabin purchased a "Preferred Professional" Policy from Defendants on April 20, 1994. **Def. Ex. 6**, at 175.

24.     Dr. Sabin paid, and still pays, $7,610.54 per year for this Policy. *Id.* at 177.

25.     The maximum monthly benefit is $15,080.00, to age 65. *Id.*

26.     "[I]f total disability begins … at age 64 but before age 65" the policy pays the
maximum monthly benefit for "30 months." *Id.* at 179.

27.     The Policy includes a "Lifetime" rider, providing lifetime benefits of "$15,000
per month." *Id.* at 178, 196.

28.     The Policy defines "Total Disability" as follows:

> 1.10    **"Total Disability"** means that because of Injury or Sickness:
>
> a.   You are unable to perform the important duties of Your Occupation; and
> b.   You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.

*Id.* at 181.

29.     A loss of earnings is not required for "total disability." *Id.*

30.     "Your Occupation" is defined as:

> 1.9    **"Your Occupation"** means the occupation or occupations in which You are regularly engaged at the time Disability begins.

*Id.*

31.     "Injury" is defined as:

> 1.5    **"Injury"** means accidental bodily injury sustained after the Date of Issue and while Your Policy is in force.

*Id.*

32.     "Sickness" is defined as:

11

> 1.6 **"Sickness"** means sickness or disease which first manifests itself af-
> ter the Date of Issue and while Your Policy is in force.  It includes
> Disability due to complications of pregnancy or childbirth.  It includes
> Disability due to normal pregnancy or childbirth after You have been
> Disabled for 90 days.

*Id.*

33.    "Important duties" is not defined.

34.    "Occupation" is not defined.

35.    For "Concurrent Disability," the Policy states:

> **6.2    CONCURRENT DISABILITY**
>
> If a Disability is caused by more than one Injury or Sickness, or from both,
> We will pay benefits as if the Disability was caused by only one Injury or
> Sickness.
>
> We will not pay more than one Disability benefit for the same period. We will
> always pay the largest benefit.

*Id.* at 188.

36.    The Lifetime rider provides, in pertinent part:

**LIFETIME TOTAL DISABILITY BENEFIT RIDER**

This rider provides a Lifetime Total Disability benefit.

**LIFETIME BENEFIT AFTER AGE 65**

We will pay this benefit during Your continuous Total Disability if:

1.  The Total Disability begins before age 65; and
2.  The Total Disability continues until age 65; and
3.  The benefits under the Policy to which this rider is added have been paid during Your Total Disability.

This benefit will start to pay on the later of: (a) Your 65th birthday; or (b) the date the Total Disability benefit payable under Your Policy ends. We will pay it while You remain Totally Disabled for as long as You live.

**FOR INJURY**

For Total Disability due to Injury, the monthly amount We will pay will be the amount shown on the Policy Schedule. Any Cost of Living benefit rider added to Your Policy shall apply to this amount.

**FOR SICKNESS**

For Total Disability due to Sickness, the monthly amount We will pay will be based on the amount shown on the Policy Schedule. Any Cost of Living benefit rider added to Your Policy shall apply to this amount. The amount shown on the Policy Schedule plus any Cost of Living increase that applies to this rider shall be multiplied by a factor. The factor to be used will be based on Your age at the start of Total Disability which continues until age 65.

**Factors by age for Total Disability due to Sickness**

| | |
|---|---|
| 1.0 for 55 or less | .5 for 60 |
| .9 for 56 | .4 for 61 |
| .8 for 57 | .3 for 62 |
| .7 for 58 | .2 for 63 |
| .6 for 59 | .1 for 64 |

If a larger amount is payable under this Policy for the same period, the larger benefit will be payable in lieu of this benefit.

*Id.* at 196.

37.     The Policy's Application indicates Dr. Sabin is an "Orthopedic Surgeon – Spine Spec.", and lists his "Exact Duties" as "Surgery of the spine / surgical spine fellowship – 1 year Univ. of CO". *Id.* at 201.

*Id.*

38.    Dr. Sabin applied for "Own Occupation" coverage:



*Id.* at 202.

**Defendants' Denial of Benefits**

39.    Dr. Sabin submitted a total disability claim in October 2020. **Ex. P,** ¶ 29.

40.    On January 6, 2021, Defendants found he could not perform surgery and that his "occupation is that of a self-employed orthopedic spine surgeon." **Ex. M**, at 1.

41.    Defendants asserted that Dr. Sabin was not totally disabled because "the medical / legal reviews you perform … are also considered to be an important duty of your occupation. . . ." *Id.* at 2.

42.    Defendants based the decision on an analysis of "Current Procedural Terminology" ("CPT") billing codes from Dr. Sabin's practice.[5] *Id.* at 1-2.

43.    CPT analysis is not specified in the Policy.  The relevant analysis is whether Dr. Sabin is unable to perform the "important duties" of his occupation. **Def. Ex. 6**, at 181.

44.    On January 6, 2021, Defendants asserted that pre-disability, "surgery only accounted for about 36% of your total charges. . .", while "medical / legal reviews accounted for your highest charges … at about 43%." **Ex. M**, at 2.

45.    Defendants' concluded: "Although surgery is considered an important duty …, the medical/ legal reviews you perform in your occupation are also considered to be an important duty . . . ." *Id.*

46.    On February 12, 2021, after reviewing additional codes, Defendants concluded that surgery accounted for 42% of total charges, and medical-legal accounted for 37%, but continued to assert that Dr. Sabin was not "totally disabled." **Ex. N**, at 2.

47.    On May 17, 2021, Defendants upheld their denial after appeal. **Ex. O**, at 2.

48.    Defendants contended that, based on their CPT analysis, "Office and legal medical reviews individually accounted for up to 30% of his practice's total charges, supporting that these services, along with surgery, were also an important duty. . . ." *Id.* at 4.

49.    Defendants' CPT analysis indicates that medical-legal work accounted for only 10% of the total "units," as opposed to "total charges," billed. **Ex. K**, at 30.

---

[5] CPT codes are standardized codes used for health insurance claims, medical records, and statistics. *See* https://www.ama-assn.org/practice-management/cpt/cpt-overview-and-code-approval.

**Defendants' Bad Faith Conduct**

50.     Several cases involving Defendants have rejected the use of CPT codes to analyze

total disability. *See McCann v. Unum Provident*, 907 F.3d 130 (3d Cir. 2018) ("We will not

define [the] occupation and its "substantial and material duties" solely by counting up billing

units."); *Natarajan v. Paul Revere Life Ins. Co*., 720 F. Supp. 2d 1321, 1332 (M.D. Fla. 2010)

(primary use of CPT analysis is a plausible RICO scheme).

51.     Defendants have been admonished by regulatory authorities for their use of CPT

analysis to distort the "important duties" of medical specialists. **Ex. S**.

52.     In 2003, the California Department of Insurance ("DOI") investigated

Defendants' claim practices and found they inappropriately utilized CPT analysis to deny total

disability benefits. *Id.* at 39-40.[6]

53.     The subsequent "Accusation" dated October 1, 2005 found that Defendants were

"determining predominately through a 'billing analysis' that the medical specialist could

continue in his or her 'occupation' even though unable to practice the specialty itself (*e.g.,*

surgery; delivering babies; chiropractic)." *Id.* at 10-11.

54.     In a "Decision and Order" dated October 3, 2005, the Insurance Commissioner

found that Defendants engaged in such improper acts and fined them over $8,500,000. *Id.* at 17-

18.

---

[6] Citations to **Exhibit S** are to the page from the original ECF "Page __ of 44" designation in blue at the top of each page; *e.g.,* reference to page "39" refers to "Page 39 of 44" in blue.

55.     In a 2010 30(b)(6) deposition, Defendants admitted that, as a result of the DOI's investigation, they should not predominantly utilize billing analysis in determining whether a claimant can perform the duties of their occupation, regardless of State. **Ex. T**, at 50:9-51:11.

56.     Defendants testified that their claim manual now contains provisions "that address how to evaluate a person's occupation. . .", and claim handlers had been so trained. *Id*. at 51:12-52:8.

57.     Defendants, however, have not implemented training on the use of CPT codes. **Ex. J**, at 84:15-85:6; 86:11-87:6; 89:17-91:13; 163:12-164:7; **Ex. U**.

58.     Defendants' analysis of Dr. Sabin's claim focused on "total charges" as reflected in CPT codes, but did not account for the time spent on tasks. **Ex. I**, at 33:11-23; **Ex. J**, at 120:5-21; 121:20-122:9; 135:2-136:1; 147:19-150:22; 152:21-153:4; 172:5-174:12; 178:4-18; **Ex. M**, at 1-2; **Ex. N**, at 2; **Ex. O**, at 4.

59.     Defendants' "vocational reviews" did not include speaking with Dr. Sabin, his employees, peers, or administrative staff to verify the "important duties" of his occupation. **Ex. B**, at 7; **Ex. H**, at 61:5-13; 65:1-67:17; 124:12-15; **Ex. I**, at 19:5-20:11; 51:3-52:11; **Ex. J**, at 73:20-74:10.

60.     Defendants never asked Dr. Sabin whether medical-legal work was an "important duty" of his occupation, nor did they ask anyone else in a position to know. **Ex. B**, at 7; **Ex. H**, at 61:5-13; 65:1-67:17; 124:12-15; **Ex. I**, at 19:5-20:11; 51:3-52:11; **Ex. J**, at 73:20-74:10.

61.     Defendants did not analyze whether the "non-surgical" CPT codes (*e.g.,* office consultations) were nonetheless directly related to the surgical practice. **Ex. J**, at 120:5-21; 121:20-122:9; 135:2-136:1; 147:19-150:22; 152:21-153:4; 172:5-174:12; 178:4-18.

62.     Defendants' vocational review specialist, Jean Marie-Merritt, who did the CPT analysis, admitted she is unaware of any procedure or standard for how to perform a CPT analysis. **Ex. J**, at 84:15-85:6; 89:17-91:13; 163:12-164:7.

63.     She acknowledged that CPT codes were not designed to be used by insurance companies to evaluate physician disability claims. *Id.* at 180:19-181:7.

64.     She admitted she has never seen anything to support that the use of CPT analysis is an acceptable practice. *Id.* at 181:8-20; 182:4-14.

65.     She was not trained – by Defendants or otherwise – on how to perform a CPT analysis. **Ex. J**, at 86:11-87:6; 181:8-20; **Ex. U**.

66.     Ms. Merritt admitted that CPT codes categorized as nonsurgical could very well have been intimately related to surgery. **Ex. J**, at 120:5-21; 121:20-122:9; 135:2-136:1; 147:19-150:22; 152:21-153:4; 172:5-174:12; 178:4-18.

67.     While Defendants' claim manual sets forth procedures for an "occupational evaluation," Ms. Merritt did not follow them. **Ex. U**; **Ex. J**, at 104:8-105:23; 109:2-111:14.

68.     The manual's "Occupational Evaluation" requires:  "In identifying the occupation and evaluating disability, we consider how the occupation is generally performed as described by vocational resources such as those listed below. . . ." **Ex. U**, at 1.  It provides that the "[r]esources that may help identify the claimant's occupation can include:

- Vocational resources such as DOT, eDOT, Occupational Outlook Handbook, etc.
- Labor market research such as ER surveys, online job postings, LMS, etc.
- Appointment books, calendars, schedules, or other evidence of how the claimant spent time prior to disability
- Billings
- JD, personnel file, etc., if the claimant is an EE of a firm that generates such materials
- Evidence of earned income, such as W-2s, tax returns, etc.
- Authored works, such as reports, memoranda, publications, etc.
- Timesheets

*Id.* at 2.

69.    Ms. Merritt admitted she did not consult these resources, nor consider how an "orthopedic surgeon" generally performs his job. **Ex. J**, at 104:8-105:23; 109:2-111:14.

70.    When asked what an "orthopedic surgeon" does, Ms. Merritt refused to answer. *Id.* at 53:3-54:8. She then professed to be unable to describe *any* occupation (*e.g.,* judge, teacher, taxi driver). *Id.* at 55:12-58:13.

71.    Although Ms. Merritt *could* have looked up descriptions of what an orthopedic surgeon does on resources such as eDOT and O*NET (as required by the claims manual), she did not do so. *Id.* at 104:8-105:23; 109:2-111:14.[7]

72.    Ms. Merritt testified that "a material and substantial duty is one that is normally required for the performance of the claimant's regular occupation and cannot be reasonably omitted or modified." *Id.,*136:9-137:19.

73.    Ryan Waterman, the claims adjuster, testified that Defendants trained him to interpret "total disability" to require an inability to perform "each and every important duty." **Ex. I**, 52:23-58:19.

---

[7] O*NET describes an orthopedic surgeon's duties, available here: https://www.onetonline.org/link/summary/29-1242.00.

74.    Defendants' witnesses would not admit that Dr. Sabin was an "orthopedic surgeon" and quibbled with the proposition that an orthopedic surgeon is a doctor who performs orthopedic surgeries. **Ex. J**, at 53:3-54:23; 64:6-69:19; **Ex. V**, at 66:16-67:3; 137:15-144:15.

## ARGUMENT

### 1.  Disputed Issues of Material Fact Regarding "Total Disability"

#### a.  Policy Interpretation

Courts have a duty to scrutinize insurance policies closely for "provisions that unduly compromise the insured's interests." *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1049 (Colo. 2011).

When interpreting undefined terms, courts give the words "their plain and ordinary meaning," *id.* at 1051, and construe them "as understood by an ordinary person, not by one engaged in the insurance business." *Id.*  Dictionaries may be used to assist. *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1091 (Colo. 1991).

"An insurance contract must be construed in favor of coverage … when provisions … are ambiguous." *Bohrer v. Church Mut. Ins. Co.*, 965 P.2d 1258, 1262 (Colo. 1998).  "An insurance policy is ambiguous if it is susceptible on its face to more than one reasonable interpretation." *Cary v. United Omaha Life Ins. Co.*, 108 P.3d 288, 290 (Colo. 2005).

#### b.  Dr. Sabin's Medical-Legal Side-Work Was Not an "Important Duty" of his "Occupation;" Alternatively, "Total Disability" is Ambiguous

For "total disability," the Policy requires one to be "unable to perform the important duties of Your Occupation."[8]  While the definition of "Your Occupation" is self-referential – *i.e.,*

---

[8] It is undisputed that Dr. Sabin remains under Dr. Maus' continuing care.

it utilizes the term "occupation" – there is no definition of "occupation" in the Policy, nor of the term "important duties."

Webster's Dictionary defines "occupation" as "the principal business of one's life: VOCATION."[9] "Important" is defined as "marked by or indicative of significant worth or consequence : valuable in content or relationship."[10] "Duty" means "obligatory tasks, conduct, service, or functions that arise from one's position (as in life or in a group)."[11]

Plaintiff's medical-legal work does not fall within the meaning of these terms. His expert work was not "the principal business" or "vocation" of his life. Dr. Sabin was an orthopedic surgeon. He spent more than 80% of his time on, and made more than two-thirds of his income from, that vocation. *See, e.g., Lemons v. Principal Life Ins. Co*., 497 F. Supp. 3d 1192 (N.D. Ala. 2020) ("'[R]egular occupation' does not refer to all of an insured's economic activity. Instead, the most natural reading … is that the term refers to an insured's primary job or discipline."); *Pittman v. Standard Ins. Co*., No. 07-3790, 2009 U.S. Dist. LEXIS 5325 (E.D. La. Jan. 15, 2009).

Nor was Medical-legal work a "duty" of Dr. Sabin's "occupation," let alone "important." *See Dowdle v. Nat'l Life Ins. Co*., 407 F.3d 967, 972 (8th Cir. 2005) (orthopedic surgeon unable to perform surgery but able to do IMEs, among other things, could not perform "the most important substantial and material duty"). Dr. Sabin was not obligated to undertake medical-

---

[9] https://www.merriam-webster.com/dictionary/occupation.

[10] https://www.merriam-webster.com/dictionary/important.

[11] https://www.merriam-webster.com/dictionary/duty.

legal work to be an orthopedic surgeon.  It was something he chose to do on the side, largely

after hours and outside the office.

But, assuming only for purposes of this response that medical-legal work somehow

qualifies as an "important duty" of Dr. Sabin's "occupation," the "total disability" definition is

ambiguous.  The clause does not specify what quantity of "important duties" the insured must be

unable to perform, nor does it provide a measuring stick to determine what is "important."

According to Defendant, "total disability" should be read its way because anything less would

render the definition of "residual disability" null. (Doc. 35 at 18-19).

But numerous courts have addressed this same argument and rejected Defendants'

interpretation.  The Eleventh Circuit explained:

> Quite obviously, there is a continuum of disability.  … At some
> point, a line must be drawn where the disability becomes so severe,
> and affects such a large percentage of the insured's material and
> substantial duties, that the disability is total rather than residual.
> The language of the Residual Disability clause does not suggest
> where that line should be drawn. . . . If [Defendant] means "all" in
> its Total Disability clause, then [Defendant] may make that simple
> change to its policy forms.

*Giddens v. Equitable Life Assurance Soc'y of the United States*, 445 F.3d 1286, 1300-01 (11th

Cir. 2006).[12]

---

[12]  *See also Leonor v. Provident Life & Accident Co.,* 790 F.3d 682, 683 (6th Cir. 2015); *Dowdle,* 407 F.3d at 970; *Cheney v. John Hancock Life Ins. Co. (U.S.A.),* 558 F. Supp. 3d 566 (N.D. Ohio 2021); *Stoneman v. Paul Revere Life Ins. Co.,* No. 12-15334, 2013 U.S. Dist. LEXIS 178604 (E.D. Mich. Dec. 20, 2013); *Hepp v. Paul Revere Life Ins. Co.,* 120 F. Supp. 3d 1328 (M.D. Fla. 2015); *Nylander v. Unum Life Ins. Co. of Am.,* 309 F. Supp. 3d 526 (M.D. Tenn. 2018); *Putnal v. Guardian Life Ins. Co. of Am.,* 2006 WL 2850424, 2006 U.S. Dist. LEXIS 70931, *15 (M.D. Ga. September 29, 2006); *Smith v. Provident Life & Accident Ins. Co.,* No. 3:17-cv-104-MCR-MJF, 2018 U.S. Dist. LEXIS 245868, *16, *24 (N.D. Fla. Sep. 28, 2018); *McFarland v. Gen. Am. Life Ins. Co.,* 149 F.3d 583, 588 (7th Cir. 1998); *Oliver v. Nat'l Life Ins. Co.,* No. 09-11040, 2011 U.S. Dist. LEXIS 134640, at *16 (E.D. Mich. Nov. 22, 2011); *Gladstone, MD v. Provident Life and Acc. Ins. Co.,* 533 F. Supp. 2d 1227, 1230 (N.D. Ga. 2007); *Ogborne v. UNUM Life Ins. Co. of Am.,* No. 04-7231, 2006 U.S. Dist. LEXIS 60880, at *10 (N.D. Ohio Aug. 28, 2006); *Phelps v. UNUM Provident Corp.,* No. 03-226, 2006 U.S. Dist. LEXIS 71020, at *8 (W.D. Ky. Sep. 29, 2006); *Gammill v.*

Defendants' attempt to distinguish such cases on the basis that "they apply interpretive rules that are contrary to Colorado law" is incorrect. They all rely on the core principle that "ambiguities in insurance contracts are construed against the insurer." *Hepp*, 120 F. Supp. 3d at 1335 (M.D. Fla. 2015); *Natarajan,* 720 F.Supp. 2d at 1326; *Leonor,* 790 F.3d at 687. Colorado follows the same interpretive rule. *See Bohrer,* 965 P.2d at 1262. The cases Defendants cite, however, represent the minority view on the ambiguity of the "total disability" clause. (Doc. 35, at 18-19).

## 2. This is Not a "Sickness" Claim

Defendants insist that this is a "sickness" claim, for which the monthly benefit is limited to $1,508. (Doc. 35, at 21). Whether Dr. Sabin's claim arises from injury, sickness, or both presents disputed issues of material fact.

While Dr. Sabin filled out the "sickness" section of the claim form, this by no means establishes that his disability arose from sickness versus injury. The Policy allows for a disability concurrently caused by both. It is the insurer's duty to reasonably investigate the claim and make determinations. *See* C.R.S. § 10-3-1114(1)(H)(IV); *Peden v. State Farm Mut. Auto. Ins. Co*., 841 F.3d 887 (10th Cir. 2016).

Defendants misstate that Plaintiff has not disclosed an expert "to opine that the cause … was other than a sickness." (Doc. 35, at 21). Plaintiff disclosed his ophthalmologist, Dr. Maus,

---

*Provident Life & Acc. Ins. Co*., 55 S.W.3d 763, 768 (Ark. 2001); *Pomerance v. Berkshire Life Ins. Co. of Am*., 654 S.E.2d 638, 640 (Ga. App. 2007).

who will testify that the cause was a combination of sickness (conjunctivitis, glaucoma) and injury (side effects of surgeries). **Ex. G**, at 5-11.[13]

The Policy specifies that for a "concurrent disability" caused by "both" sickness and injury, Defendants "will always pay the largest benefit." **Def. Ex. 6**, at 188.  Under the Lifetime rider, disability caused by "injury" is paid in a monthly "amount shown on the Policy Schedule." *Id.* at 196.  That amount is "15,000.00." *Id.* at 178.[14]

### 3. Disputed Issues of Material Fact - Bad Faith

#### a. Standards

"[W]hat constitutes reasonableness under the circumstances is ordinarily a question of fact for the jury." *Bankr. Estate of Morris v. COPIC Ins. Co.,* 192 P.3d 519, 524 (Colo. App. 2008).

For a common law bad faith claim, the insurer must have: "(1) acted unreasonably; and (2) knew or recklessly disregarded the unreasonableness of [their] conduct." *Sandoval v. Unum Life Ins. Co. of Am.,* 952 F.3d 1233, 1236 (10th Cir. 2020).  The statutory claim requires only that Defendants "unreasonably delayed or denied payment of benefits," *i.e.*, not "knowing or reckless conduct." *Id.*

Good faith requires insurers to, among other things, reasonably investigate and adjust a claim, *State Farm Auto. Ins. Co. v. Brekke*, 105 P.3d 177, 189 (Colo. 2004), and not make a deliberate decision to avoid paying where there is evidence of coverage. *See Novell v. Am.*

---

[13] Dr. Sabin, a medical doctor, will also testify to his own understanding of his condition. **Ex. B**, at 2; **Ex. G**, at 12-14.

[14] For the first 30 months of Dr. Sabin's disability, which began at age 64, he is due the monthly total disability amount of $15,080.00, regardless of "sickness" or "injury." *Id.* at 179, 196.

*Guard. & Liab. Ins. Co.*, 15 P.3d 775, 779-781 (Colo. App. 1999); *Brodeur v. Am. Home Assurance Co.*, 169 P.3d 139, 147 fn. 7 (Colo. 2007).

For a common law claim, "fair debatability" cannot establish that an insurer's denial was reasonable as a matter of law. *See Sanderson v. Am. Family Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010); *Geiger v. Am. Std. Ins. Co.*, 192 P.3d 480, 484 (Colo. App. 2008); *Vaccaro v. American Family Ins. Group*, 275 P.3d 750, 760 (Colo. App. 2012); *Nibert v. Geico Cas. Co.*, 2017 COA 23, ¶ 12.[15]

**b. Defendants' Bad Faith Conduct**

Courts around the country have admonished Defendants that their definition of "total disability" is ambiguous, and that the clause should <u>not</u> be interpreted to require inability to perform "each and every" important duty. *See Leonor,* 790 F.3d at 683; *Stoneman,* 2013 U.S. Dist. LEXIS 178604; *Hepp,* 120 F. Supp. 3d 1328; *Nylander*, 309 F. Supp. 3d 526; *Smith,* 2018 U.S. Dist. LEXIS 245868, *16, *24; *Gladstone,* 533 F. Supp. 2d at 1230; *Ogborne*, 2006 U.S. Dist. LEXIS 60880, at *10; *Phelps*, 2006 U.S. Dist. LEXIS 71020, at *8; *Gammill*, 55 S.W.3d at 768. But Defendants continue to do so, and have not trained their claim handlers otherwise.

California fined Defendants $8,500,000 for these same practices, including misusing CPT analysis to reclassify physicians like Dr. Sabin out of their specialties. Courts have found that these Defendants' primary use of CPT codes constitutes a "plausible RICO scheme." *Natarajan*, 720 F. Supp. 2d at 1332; *Hepp*, 120 F. Supp. 3d at 1344.

---

[15] "Fair debatability" is not relevant to a statutory claim under C.R.S. § 10-3-1115. *Nibert*, *supra* at ¶ 15.

Defendants primarily, if not exclusively, utilized CPT analysis to conclude that Dr. Sabin's "occupation" included doing "medical-legal" work, and that it was an "important duty." Defendants were unwilling, however, to answer in deposition whether Dr. Sabin is able to perform the duties of an "orthopedic surgeon." Defendants' witnesses assert that one can be an "orthopedic surgeon" without being able to perform surgeries, and some quibbled whether Dr. Sabin was even an "orthopedic surgeon."

The CPT analysis is neither stated in the Policy, nor is it the procedure in the claim manual. The manual's "Occupational Evaluation" procedure requires an analysis of how the occupation is "generally performed" and to utilize "vocation resources" such as the Dictionary of Occupational Titles to identify the duties. Defendants did not do so here.

Defendants' CPT analysis was, by their own admission, flawed. *See, e.g., McCann v. Unum Provident,* 907 F.3d 130, 150 (3d Cir. 2018) (rejecting CPT analysis; "We will not define [the insured's] occupation and its 'substantial and material duties' solely by counting up billing units."). Defendants' expert accountant's report and testimony reinforces the shortcomings of the CPT analysis and shows how Dr. Sabin's career came to an abrupt end in July 2020. **Ex. V**, at 61:9-64:25; 86:20-87:10 (RVU (Relative Value Unit) analysis, and not CPT analysis, more accurately captures the "productivity of physicians"). Mr. Smith's analysis indicates that following July 2020, Dr. Sabin's "work RVUs" as an orthopedic surgeon plummeted to zero. **Ex. W**, at 15-17, 20-22.

Ms. Merritt admits she is unaware of any procedure or standard for how to perform a CPT analysis, was not trained to perform CPT analysis, and that the CPT codes she identified as "non-surgical" could well have been intimately related to Plaintiff's surgical practice.

Laura Parker, Plaintiff's bad faith expert, opines that Defendants failed to comport with industry standards by: (1) rendering inaccurate determinations by failing to conduct a reasonable investigation into Dr. Sabin's occupation and duties by focusing on "total charges" from CPT codes (**Ex. K**, at 18-33); (2) treating the claim as one for "sickness" based only on how Dr. Sabin filled out his claim form (*id.* at 35); (3) failing to follow the claim manual's procedures (*id.* at 38); (4) "knowingly" handling Dr. Sabin's claim in contravention of prior cases in which Defendants were involved (*id.* at 39); and (4) violating Colorado's Unfair Claim Settlement Practices Act. *Id.* at 40.

Defendants' conduct clearly goes well beyond the standards for common law and statutory "bad faith" and, at the very least, establishes disputed issues of material fact. *See, e.g., Giampapa v. Am. Family Mut. Ins. Co.*, 919 P.2d 838 (Colo. App. 1995); *Burgess v. Mid-Century Ins. Co.*, 841 P.2d 325 (Colo. App. 1992); *Brewer v. Am. & Foreign Ins. Co.*, 837 P.2d 236 (Colo. App. 1992).

### 4.  Statutory Damages Apply to All Denied Benefits

Defendants seek a ruling that the "two times the covered benefit" damages provided by C.R.S. § 10-3-1116 apply only to "past due benefits." (Doc. 35, at 25-26).  This argument is inconsistent with the plain language of the statute.

Section 10-3-1115(1)(a) provides that an insurer "shall not unreasonably delay or deny payment of a claim. . . ."  Section 10-3-1116(1) states that Dr. Sabin "may bring an action … to recover … two times the covered benefit."

Defendants denied Dr. Sabin's claim for "total disability" benefits in its entirety.  The Policy provides a "lifetime" benefit.  Dr. Sabin's condition is indisputably permanent.  Assuming

the denial was unreasonable, the "covered benefits" include all benefits Dr. Sabin is owed under

the Policy, both past and future.  Defendants' insistence that future benefits have not yet been

denied is clearly false.  Defendants have "denied" all benefits, including for the remainder of Dr.

Sabin's life.

There is nothing in the statute restricting its application to only "past due benefits."  The

Court should apply the plain language of the statute, without adding terms. *See People v.*

*Jaramillo,* 183 P.3d 665, 671 (Colo. App. 2008).

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully request that the Court deny

Defendants' Motion in its entirety.

Respectfully submitted this 24th day May 2024.

By: *s/ Zachary C. Warzel*

Zachary C. Warzel
Ross W. Pulkrabek
1290 Broadway, Suite 600
Denver, CO 80203
Telephone: (303) 534-0401
Facsimile: (303) 534-8333
Email: rpulkrabek@keatingwagner.com
Email: zwarzel@keatingwagner.com

*Attorneys for Plaintiff Jeffrey Sabin, M.D.*

I hereby certify that the foregoing pleading complies with the type-volume limitation set

forth in Judge Domenico's Practice Standard III(A)(1).

## CERTIFICATE OF SERVICE

I certify that on May 24, 2024, a true and correct copy of the foregoing was served electronically upon the following:

**Counsel for Defendants:**

Elizabeth Michaels
1601 19th Street, Suite 1000
Denver, CO 80202
EMichaels@lewisroca.com

*s/ Leslie J. Ruiz*

By: _____

Leslie J. Ruiz, Litigation Paralegal
Keating Wagner Polidori Free, P.C.
